## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

SHARON RUTSCH *as p/n/g of* R. R, F.R. *and on behalf of herself;* ABIGAIL SPICER as *p/n/g* of H.Z, M.Z., R.Z., *and on behalf of herself;* ANDREW SPICER

*Plaintiffs*

*against*

ONTARIO COUNTY,
ONTARIO COUNTY SHERIFFS OFFICE,
INVESTIGATOR NATHAN BOWERMAN
*in his personal capacity*, UNKNOWN ERT
OFFICER *in his personal capacity*

*Defendants*

**COMPLAINT**

Case No.
 **6:22-cv-06369**

Jury Trial:  ☒Yes

PRELIMINARY STATEMENT

1.  On the evening of February 22, 2022, Sharon Rutsch watched as an armored vehicle slowly pierced through the quiet darkness surrounding her rural home. Men dressed in military fatigues aimed assault weapons at Mrs. Rutsch and her sister Abigail Spicer. These men handcuffed the sisters, shoved them into the dimly lit, military vehicle, and drove away. Despite the horror, Mrs. Rutsch and Ms. Spicer could only think about their small children inside the home. Their brother, Andrew Spicer was inside the house with the five (5) children. Eventually, these men forced Andrew and the children into an armored vehicle.

2.  When the house was empty, this small military unit descended upon it with the zeal of a Navy SEAL team hunting terrorists. They threw flashbang grenades into hallways, and rooms. They cautiously walked through the home—with their weapons in the firing position—as though danger lurked in every corner. They tore through every inch of Mrs. Rutsch's property; destroying every happy memory in the process.

3.  Except these men were not soldiers. They were members of the Ontario County Sheriff's Office Emergency Response Team (ERT). The home they invaded belonged to a United States Army veteran and his family. There were no "bad guys" hiding in the washer machine or under the children's beds. There was no emergency. There was no reason for them to be there.

4.  Hours earlier, members of the Ontario County Sheriff's Office (OCSO) placed a proverbial bomb on the Fourth Amendment, and lit the fuse; culminating in the invasion that occurred in the evening.

5. Defendant Bowerman recklessly disregarded the truth; ignoring, what was in plain sight. Defendant Bowerman obtained a general warrant based on omissions and mistruths; he uttered under oath. ERT blindly executed the search warrant even though its defects were apparent and in violation of clearly established law. ERT conducted a military raid on a quiet American home filled with innocent women and children. Consequently, Defendants violated Plaintiffs' rights under the Fourth Amendment, and New York State Constitution Article I Section XII. On February 22, 2022, the linchpin of reasonableness was nowhere to be found. Plaintiffs' will never be the same again. Plaintiffs commence this action accordingly.

## PARTIES

6. Plaintiff Sharon Rutsch resides, and resided at 4850 Townline Road, Rushville, New York (Property) at all relevant times herein.

7. Plaintiff Abigail Spicer is a United States citizen who was in Property on February 22, 2022, at all relevant times herein.

8. Plaintiff Andrew Spicer resides, and resided at 4850 Townline Road, Rushville, New York (Property) at all relevant times herein.

9. Plaintiff R.R. is Sharon Rutsch's minor child who resides, and resided at Property at all relevant times herein.

10. Plaintiff F.R. is Sharon Rutsch's minor child who resides, and resided at Property at all relevant times herein.

11. Plaintiff H.Z. is Abigail Spicer's minor child and was in Property on February 22, 2022, at all relevant times herein.

12. Plaintiff M.Z. is Abigail Spicer's minor child and was in Property on February 22, 2022, at all relevant times herein.

13. Plaintiff R.Z. is Abigail Spicer's minor child and was in Property on February 22, 2022, at all relevant times herein.

14. Defendant Ontario County is a municipal corporation organized under the laws of the State of New York that employs, trains, and oversees a sheriff's office to enforce numerous laws within its geographical boundaries. Ontario County's principal place of business is located at 20 Ontario Street, Canandaigua, New York 14424.

15. Defendant Ontario County Sheriff's Office is a law enforcement agency operating under, and on behalf, of Ontario County, tasked with enforcing the New York State Penal Law and local laws within Ontario County. It is headquartered at 74 Ontario Street, Canandaigua, New York 14424.

16. Defendant Nathan Bowerman is, and was, a member of the Ontario County Sheriff's Office, Criminal Investigation Division, who was responsible at all relevant times for investigating allegations against Mrs. Rutsch, and was acting at all times referenced herein under color of law.

17. Unknown ERT Officer is believed to be a member of the Ontario County Sheriff's Office who commanded the Emergency Response Team, directed its members, and executed an unlawful search warrant. Unknown ERT Officer was acting under color of law at all times referenced herein.

<u>JURISDICTION</u>

18. This Court has original jurisdiction pursuant to 28 U.S.C. §1331. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

## VENUE

19. The United States District Court for the Western District of New York is the proper venue pursuant to 28 U.S.C. §1331 (b)(1) and (b)(2) as it is the judicial district in which Defendants deprived Plaintiffs of their rights under the Constitution of the United States and it is where a substantial part of the events giving rise to Plaintiffs' claims occurred.

## STATEMENT OF FACTS

20. Plaintiff Sharon Rutsch (Rutsch) lived with her husband Eric Rutsch and their two children—R.R and F.R—at 4850 Townline Road, Rushville, New York (Property) at all relevant times herein.

21. Eric Rutsch served this country as a soldier in the United States Army.

22. Plaintiff Andrew Spicer is Mrs. Rutsch's and Abigail Spicer's brother. He lived in a small room in the basement of Property at all relevant times herein.

23. Plaintiff Abigail Spicer is Mrs. Rutsch's and Andrew Spicer's sister. Mrs. Spicer and her three minor children—H.Z., R.Z., and M.Z—were visiting Mrs. Rutsch at all relevant times herein.

24. Abigail Spicer served this country as a member of the United States Air force.

## THE UNDERLYING INCIDENT

25. On February 21, 2022, at approximately 10:30 p.m. a woman name Michelle Lohnes (Lohnes) drove to Property.

26. Lohnes was not invited.

27. Lohnes was acquaintances with Mrs. Rutsch through their husbands.

28. Mr. Rutsch was battling alcoholism but had refused to get treatment.

29. Mrs. Rutsch sought help from Mr. and Mrs. Lohnes to persuade Mr. Rutsch to go to treatment.

30. Mrs. Rutsch and Lohnes had reached an impasse and Mrs. Rutsch informed Lohnes to stay away from her, and her family.

31. Lohnes knew that Mrs. Rutsch lawfully owned a handgun.

32. Lohnes knew Mr. Rutsch lawfully owned firearms.

33. Lohnes did not own a vehicle at the time.

34. There was a prominent no trespassing sign attached to a gate preventing access to Property's driveway.

35. Lohnes opened the gate blocking the driveway.

36. Lohnes entered property without permission or authority.

37. Mrs. Rutsch and Andrew Spicer saw a vehicle they did not recognize driving onto Property.

38. Lohnes exited the vehicle and walked briskly to the front door.

39. Mr. Spicer stood by the door to prevent any conflict.

40. Lohnes through, tried forcing the front door open.

41. Andrew Spicer stopped her from entering Mrs. Rutsch's home by pushing his weight against the door.

42. Lohnes continued to force her way into Property.

43. Mrs. Rutsch came to the door and demanded Lohnes leave Property several times.

44. Lohnes refused to leave Property.

45. Mrs. Rutsch and Lohnes wrestled to the ground.

46. Mrs. Rutsch pinned Lohnes down and demanded that she leave the Property.

47. Lohnes refused.

48. Lohnes tried getting up but slipped and her face hit the cold, hard ground.

49. A piece of plywood was nearby.

50. Lohnes and Mrs. Rutsch exchanged a few punches on the front lawn of Property.

51. Lohnes punched Mrs. Rutsch in the face.

52. Mrs. Rutsch was wearing a bracelet.

53. A **crescent moon** was in the center of the bracelet.

54. Lohnes was bleeding on the left side of her face outside of Property.

55. Lohnes bled on the piece of plywood on the front of Property.

56. During the altercation Mrs. Rutsch had pinned Lohnes to the ground several times.

57. Mrs. Rutsch asked Lohnes " do you give up?" each time.

58. Mrs. Rutsch even tried reasoning with Lohnes to leave her property.

59. But, Lohnes continued to attack Mrs. Rutsch on Mrs. Rutsch's front lawn.

60. Lohnes even cackled numerous times.

61. Lohnes eventually left Property.

62. Mr. Spicer witnessed the altercation.

63. After the fight, Lohnes and Mrs. Rutsch launched very personal insults at each other through text messages. They said hurtful words that cannot be taken back.

<u>LOHNES NARRATIVE THE DAY AFTER</u>

64. On February 22, 2022, at approximately 12:30 pm Lohnes contacted law enforcement for the first time.

65. Lohnes resides in neighboring Yates County.

66. Upon information and belief, Lohnes' mother is employed by the Yates County Sheriff's Department.

67. A deputy (Deputy) for the Ontario County Sheriff's Department (OCSO) responded to her home in Yates County.

68. Upon information and belief, it is the OSCO's policy that complainants must go to the precinct to file complaints.

69. Deputy arrived at Lohnes' house at approximately 1:00 pm.

70. Investigator Bowerman (Bowerman) arrived shortly after, along with other law enforcement personnel (collectively OCSO).

71. Lohnes spoke with Deputy for approximately ten minutes.

72. Lohnes asked Deputy if they were going to arrest her for being on Mrs. Rutsch's Property.

73. Lohnes said "now that I went over there they can have me arrested right?"

74. Lohnes asked Defendant Bowerman as soon as he arrived at her house if she was going to get in trouble for being on Rutsch's property.

75. Bowerman said not if you were invited.

76. An unknown male was at the house.

77. Lohnes had spoken about the incident with this unknown male before the police arrived.

78. The unknown male said to Bowerman "I know [Lohnes] was in her property but because everyone's friends, they're both in the wrong."

79. Bowerman disregarded it.

80. Lohnes had slight contusions under each eye.

81. Lohnes had an imprint of a crescent moon on the left side of her face, in the exact same spot as a small laceration located on her left cheekbone.

82. The crescent is almost perfectly symmetrical.

83. Lohnes also had a swollen lip and bruises on her forehead, back, and right arm.

84. Lohnes said she went to a local hospital immediately after the altercation on the 21st .

85. On February 21, 2022, Lohnes never contacted law enforcement.

86. Lohnes never mentioned a handgun to any hospital personnel.

87. Lohnes told personnel at the hospital that she got into a fight.

88. Lohnes received stitches for the crescent shaped laceration on the left side of her face.

89. Lohnes stated that she was arguing with Mrs. Rutsch over the phone on February 21, 2022.

90. Lohnes claimed that she asked Mrs. Rutsch to meet her at some nearby gas station to speak.

91. Lohnes did not say the name of the gas station.

92. Lohnes referenced that this discussion occurred through text messages.

93. An OCSO Investigator took photographs of text messages on Lohnes' phone, but no such text messages existed.

94.  Mrs. Rutsch never went to any gas station.

95. Lohnes said that Mrs. Rutsch then invited her to come to Property.

96. Lohnes also said Mrs. Rutsch told her that she would kick Lohnes' ass if she showed up at Mrs. Rutsch's house. Lohnes said she told Mrs. Rutsch she was not afraid of her.

97. Lohnes then drove to Mrs. Rutsch's house.

98. Lohnes told OCSO that she went to the door and Mrs. Rutsch grabbed her and they fell to the ground.

99. Lohnes said that Mrs. Rutsch's was on top of her.

100.    Lohnes reached back to grab Mrs. Rutsch's hair but slipped and fell face first into the ground.

101.    Lohnes then claimed that Mrs. Rutsch straddled her but did not punch her. She said Mrs. Rutsch tried talking to her.

102.    Lohnes refused to leave Mrs. Rutsch's property and continued to fight her.

103.    Lohnes said "I started laughing, my gut hurt so hard."

104.    Lohnes told OSCO that Mrs. Rutsch straddled her and said, "do you give?" several times.

105.    Lohnes told OSCO "and I'm like what the hell is this a wrestling match?"

106.    Lohnes refused to leave Mrs. Rutsch's property and continued to fight her.

107.    Lohnes got up from the ground.

108.    Lohnes and Mrs. Rutsch tried punching the another but none of the punches connected.

109.    Lohnes said Mrs. Rutsch was on top of her another time.

110.    Lohnes told OSCO that "I said you're sitting on top of me again" and that Lohnes began laughing again.

111.    Lohnes claimed, that Mrs. Rutsch then suddenly yelled over to Andrew "grab my Glock. Grab my nine-millimeter."

112.    Lohnes alleged that Andrew said no.

113.    Next, according to Lohnes, Mrs. Rutsch got up walked towards her home, walked up the front porch stairs, opened the front door, went somewhere, grabbed a gun, walked back, and opened the door to go  back outside.

114.    And according to Lohnes, after this prolonged altercation, Lohnes just stood there, waiting on Mrs. Rutsch's front lawn.

115.    She did not leave.

116.    She did not call the police.

117.    She did nothing.

118.    Lohnes said that Mrs. Rutsch yelled "leave!" from  the front porch three times.

119.    Lohnes said she then went to her car.

120.    She sat down and began to start the car, and the window was down.

121.    Lohnes told OSCO that Mrs. Rutsch then "smashed" her in the nose with a firearm.

122.    Upon information and belief, the average temperature on February 21, 2022, was twenty-seven degrees Fahrenheit.

123.    When Lohnes first spoke with the Deputy she said Mrs. Rutsch pointed a gun at her and told her to leave.

124.    She did not include this part when the Deputy was preparing a supporting deposition containing Lohnes sworn statement.

125.    The Deputy reminder her that she had said Mrs. Rutsch pointed a gun at her when she first came out of the house.

126.    Lohnes said "oh yea, she did."

127.    The Deputy edited Lohnes statement to include this.

128.    Lohnes said that Mrs. Rutsch then hit her again in the face with a gun as she was driving away.

129.    Lohnes claimed that she started to bleed in the car.

130.    Lohnes' signed a sworn supporting deposition of her statement understanding that any false statements made therein is punishable as a class A misdemeanor.

131.    The supporting deposition says Mrs. Rutsch hit her on the right  side of her face as she was driving.

132.    Lohnes told OSCO that she recognized the handgun to be the same one she had shot before.

133.    Lohnes had no idea what part of the handgun she was allegedly hit with.

134.     Lohnes unequivocally described the handgun as all black.

135.    Lohnes did not provide a single detail about this alleged black gun other than it being black.

136.    Mrs. Rutsch did not own a Glock.

137.    Mrs. Rutsch did not own a black handgun either.

138.    Mrs. Rutsch lawfully owned a grey, Sig Sauer P938 handgun (Sig).

139.    The Sig's slide and barrel are completely grey/silver.

140.    Its grip is black.

141.    Mrs. Rutsch safeguarded Sig in a biometric safe located in her bedroom inside Property.

142.    Lohnes never stated nor insinuated that Mrs. Rutsch unlawfully possessed a firearm.

143.    Lohnes necessarily implied the alleged gun was lawfully owned.

144.    The OCSO could have easily verified that Mrs. Rutsch did not own a Glock.

145.    But they did not.

146.    Lohnes gleefully told OSCO that she had heard from Eric Rutsch that he believed Mrs. Rutsch had "acid" (LSD) hidden somewhere in the house, but he did not know where.

147.    Lohnes never told OSCO that she observed LSD.

148.    Lohnes also told OSCO that Eric Rutsch had told her that he suspected Mrs. Rutsch was using cocaine off and on, but Lohnes said Eric did not know for sure though.

149.    Lohnes never told OSCO that she observed cocaine.

150.   Lohnes also stated that she had observed—by her estimate—forty to fifty marijuana plants in the basement of Property.

151.   Yet Lohnes' alleged basis of knowledge was that she smelled it. Lohnes never claimed to observe plants.

152.   Lohnes did not provide necessary details to establish her veracity.

153.   Lohnes did not say how much time elapsed since she was last in Property, what types of pots the alleged cannabis plants were in, the size of the space, how she knew that there were 40 to 50 plants, what stages of growth they were in, whether there was a ventilation system,  a cooling system, grow tents, or the like.

154.   In 2021 New York State legalized growing, selling, and ingesting cannabis; subject to regulation.

155.   Lohnes stated Mrs. Rutsch probably sold cannabis but likewise failed to provide a single fact to corroborate it. She never observed Mrs. Rutsch sell cannabis and could not provide any facts or indicia of selling cannabis.

156.   Lohnes did not claim to observe any sales, scales, dealer logs, money, receipts, consistent flow of people going in and out of Property for short periods of time, erratic spending patterns, ownership of items beyond Mrs. Rutsch's means, phone conversations, baggies, Ziplock bags, cash counting machines, or any other single thing supporting the sale of cannabis.

157.   Several times during the interview Lohnes began cackling uncontrollably.

158.   Lohnes' behavior vacillated from casual to excited while speaking.

159.    Lohnes casually answered the telephone several times when she was speaking with the sheriffs.

160.    Lohnes spent more time gossiping about Mrs. Rutsch than the alleged incident.

161.    Bowerman stood in the doorway of Lohnes kitchen when she was interviewed.

162.    Bowerman asked one or two follow up questions at most.

163.    Lohnes said she had been at Mrs. Rutsch's house multiple times but was unable to give any part of Mrs. Rutsch's address without looking it up.

164.    Lohnes' nose was barely bruised.

165.    Her nose did not even have a scratch on it.

166.    The laceration on her face was a superficial wound in the exact shape of Mrs. Rutsch's crescent moon.

167.     She also had a swollen lip and some contusions on her back and right arm.

168.    Lohnes did not have any injuries consistent with blunt force trauma from being hit with a handgun.

169.    She had no fractured bones.

170.    There were no distinctive marks matching any part of a handgun.

171.    The only distinctive mark on Lohnes' face was the shape of a crescent moon.

172.    While Lohnes claimed there were weapons in Property she did not provide any corroborating details. Lohnes did not even insinuate that there were illegal firearms.

173.    She did not state where the lawfully owned firearms were kept, how many there were, what they looked like, whether there were magazine or ammunition or the like.

## DRONE SURVEILLANCE

174.   Around 1:30 p.m. on February 22, 2022—very shortly after the OCSO began speaking with Lohnes—Defendant Bowerman sent two OCSO deputies to conduct surveillance of Property.

175.   Said deputies parked a red, unmarked vehicle in front of Property.

176.   The deputies took pictures of Property with appeared to be a cellular phone.

177.   The deputies utilized an electronic drone to conduct surveillance of Property.

178.   The drone flew around Property.

179.   The drone took video and or pictures of Property.

180.   Said picture and/or video could not be obtained from a space available to the public.

## SEARCH WARRANT AFFIDAVIT AND WARRANT

181.   On February 22, 2022. Defendant Bowerman—under oath—signed an affidavit for a search warrant application.

182.   Only five—out of twelve—paragraphs contain alleged facts in support of the warrant.

183.   Pictures taken by the two deputies in the red car were attached to the warrant affidavit.

184.   The affidavit's first page described Property, and mentions that there are several detached buildings.

185.   Bowerman sought evidence of the crimes of Penal Law (PL) section 120.05 (assault in the second degree) section 265.03 (criminal possession of a weapon in the

2nd degree), section 120.14 (menacing in the 2nd degree), and section 220.02 (criminal possession of a controlled substance in the 7th degree).

186. Specifically, Bowerman applied to search for, and seize (1) "handguns, magazines, ammunition, holsters, and other peripheral property associated with the possession and ownership of a handgun" (2) "drugs including but not limited to LSD and cocaine" and (3) "bloody clothing, shoes, or other personal property."

187. Bowerman's affidavit was based exclusively on what Lohnes stated and the aforementioned pictures.

188. Upon information and belief, Bowerman did not conduct an independent investigation or independently corroborate anything Lohnes said.

189. Bowerman misrepresented material allegations and omitted material allegations in the affidavit.

190. Bowerman swore that Mrs. Rutsch asked Andrew to grab her gun. But Lohnes claimed that Mrs. Rutsch asked Andrew to grab her "Glock, [her] 9mm" as opposed to her gun.

191. Bowerman averred that Lohnes described the gun as a black " 'glock' [*sic*] style handgun." Lohnes could only describe a black gun. Lohnes was not able to say who manufactured the alleged handgun, and certainly did not say that it was a Glock styled gun.

192. Bowerman said Mrs. Rutsch—as alleged by Lohnes—pointed a gun at Lohnes and said she was going to kill her. However, Lohnes stated that Mrs. Rutsch pointed a gun at her and shouted for her to leave three times. Lohnes also stated—albeit

inconsistently— that Mrs. Rutsch said "I am going to kill you and Matt. " A third time, Lohnes left this part out of her story entirely.

193.    When describing Lohnes' allegations that she was hit twice by a gun, Bowerman says Lohnes was first hit in the face. But Lohnes specifically said she was hit in the nose.

194.    Bowerman then affirms that Lohnes stated Mrs. Rutsch struck her under the left eye. Lohnes swore—under penalty of making a false statement in violation of the Penal Law—that she was hit in the right eye.

195.    Lohnes also never clearly articulated where she claimed to be hit.

196.    Bowerman stated that Mrs. Rutsch caused Lohnes to have a "serious laceration." Bowerman had no basis—nor did he claim to have one—to conclude that that Lohnes sustained a serious laceration.

197.    The laceration appears small.

198.    Lohnes did not state how many stitches she received, the size of the wound, or whether she received any pain medication.

199.    Bowerman completely omitted that the laceration was part of a very distinct, crescent shaped object.

200.    Bowerman also omits how Lohnes fell face first into the ground.

201.    Bowerman affirms that Lohnes had been inside Property multiple times and had been friends with Mrs. Rutsch for several years. He avers that Lohnes observed "several long guns and handguns inside. Lohnes stated that she had also shot the handguns before."

202.   Bowerman provides no facts as to where Lohnes allegedly observed firearms, where they were stored, when she observed them, how many she saw, the type of guns, models, or similar corroborating details.

203.   Bowerman does not assert any facts to rebut staleness.

204.   There is no nexus between these items and the evidence of a crime Bowerman sought. Bowerman did not claim they were unlawfully owned. Bowerman omits that Mr. Rutsch is a veteran who separately and lawfully could have owned firearms.

205.   Lohnes claimed Mrs. Rutsch hit her with a black handgun. Bowerman recklessly pluralizes handgun.

206.   Bowerman next falsely states that Lohnes claimed she "recently observed Mrs. Rutsch to be in possession of LSD and cocaine within the residence."  This is a direct fabrication.

207.   Lohnes never said she observed—let alone *recently observed*—LSD and cocaine within the Property. Bowerman not only fabricated the existence of drugs in Property, but he also omitted the source of the information—albeit Eric Rutsch.

208.   Bowerman adds next that Mrs. Rutsch spends a lot of time in what Lohnes called a "she shed." Followed by "[t]here are several outbuildings on the property."

209.   Bowerman does not provide any facts about the "outbuildings" other than they exist.

210.   The subsequent paragraph requests that the warrant be executed at any time of the day or night because of the time it was going to take to plan and execute the search warrant.

211.    Finally, Bowerman sought a "no-knock" warrant because Mrs. Rutsch had access to weapons and Mrs. Rutsch's husband received  military training so he may have "passed along tactical training" to Mrs. Rutsch.

212.    Nowhere does Bowerman provide facts of an evidentiary nature to corroborate his beliefs.

213.    Bowerman subsequently secured a general warrant to search "the residence, curtilage and outbuildings located at 4850 Townline Rd Gorham, NY."

214.    A judge issued a warrant permitting the search Property, its curtilage and outbuildings for (1) "handguns, magazines, ammunition, holsters, and other peripheral property associated with the possession and ownership of a handgun" (2) "drugs including but not limited to LSD and cocaine" and (3) "bloody clothing, shoes, or other personal property."

215.    The warrant permitted Defendants to search at any time without giving notice.

216.    Bowerman knew that Mr. Rutsch would not be in Property.

217.    Bowerman knew that R.R. and F.R. lived in Property.

218.    Bowerman knew that Andrew Spicer lived in Property.

## THE INVASION

219.     On February 22, 2022, at approximately 8:00 p.m. Mrs. Rutsch and Ms. Spicer were sitting outside of Property.

220.    An armored, military vehicle drove down the driveway.

221.    Upon information and belief the vehicle was a Lenco Bearcat SWAT vehicle.

222.    Besides the capability of withstanding the impact of fifty caliber bullets, it also has a machine gun turret opening in the roof.

223.    Members of the Ontario County Sheriff's Office Emergency Response Team (ERT) were in the armored vehicle.

224.    The armored vehicle stopped approximately fifteen yards from Mrs. Rutsch and Ms. Spicer.

225.    A voice announced from a loudspeaker that they were the OCSO and that they had a warrant. The voice commanded the residents of Property to come out.

226.    Mrs. Rutsch and Ms. Spicer walked towards the armored vehicle.

227.    An ERT officer (ERT Officer) commanded them to put their hands in the air and to not walk any further.

228.    Mrs. Rutsch and Ms. Spicer complied.

229.    Mrs. Rutsch and Ms. Spicer asked to see a warrant.

230.    Neither Mrs. Rutsch nor Ms. Spicer were shown a search warrant.

231.    ERT members exited the vehicle.

232.    They were dressed in full military fatigue.

233.    Upon information and belief, they possessed military grade tactical gear such as bulletproof vests, night vision goggles and helmets. They had military grade lighting inside and outside the vehicle.

234.    The ERT members were armed with assault rifles and flashbang grenades.

235.    The assault rifles were equipped with holographic sites, foregrips, and telescoping stocks.

236.   The ERT members had pockets for extra magazines and ammunition.

237.   ERT members pointed their rifles at the two unarmed women.

238.   At approximately 8:01 p.m. an ERT member commanded Ms. Spicer to turn her back to the vehicle and slowly walk backwards.

239.   Ms. Spicer had her cellphone in her right hand.

240.   Ms. Spicer was recording with her phone.

241.   At some point an ERT member approached Ms. Spicer and knocked her cellphone out of her hand.

242.   The cellphone fell to the ground.

243.   Ms. Spicer's shoe fell off as she was walking towards the vehicle.

244.   ERT members did not allow her to retrieve her shoe.

245.   At approximately 8:03 p.m. An ERT member commanded Mrs. Rutsch to walk towards the back of the vehicle.

246.   At approximately 8:05 p.m. ERT Officer aimed a taser gun at Ms. Spicer. ERT Officer threatened to shoot Ms. Spicer if she did not walk towards the back of the vehicle.

247.   Ms. Spicer walked towards the back of the vehicle.

248.   The ERT Officer pushed her to the ground.

249.   ERT members placed her in handcuffs.

250.   ERT members searched her person.

251.   At approximately 8:06 p.m. the ERT Officer threatened to shoot Mrs. Rutsch with the taser gun if she did not walk to the back of the vehicle.

252. Mrs. Rutsch kneeled to the ground.

253. ERT members placed handcuffs around her wrists and ordered her into the vehicle.

254. At approximately 8:09 p.m. Mrs. Rutsch was inside the vehicle.

255. ERT Officer said he did not know what they were looking for but that they were just there to execute a search warrant.

256. Investigator Bowerman was at the scene.

257. Mrs. Rutsch was visibly terrified.

258. She was shaking.

259. Mrs. Rutsch was concerned about her children inside of property.

260. All her questions went unanswered.

261. ERT Officer told them to be quiet and to shut up.

262. ERT transported Mrs. Rutsch and Ms. Spicer to patrol vehicles parked in front of, and to the side of Property.

263. ERT Officer stated that he did not know anything more than that they were there to execute a search warrant and that the investigator would explain what was going on later.

264. Both women told ERT members that Andrew was inside with their children.

265. ERT members had no basis to believe that Mr. Spicer was armed or dangerous.

266. At approximately 8:24 p.m. ERT members ordered Andrew to exit Property with his hands in the air.

267. Andrew complied.

268.   ERT members did not see anything on his person that could be a weapon.

269.   Around 8:25 p.m. ERT Officer ordered Andrew to walk backwards towards his voice nice and slow.

270.   ERT members placed Andrew face down on the ground and pulled his arms behind his back and placed him in handcuffs.

271.   ERT Officer searched Mr. Spicer's person.

272.   Andrew confirmed that there were five (5) children in the house. The oldest being fourteen (14) and the youngest being three (3) years old.

273.   Around 8:27 p.m. ERT members rolled Andrew up and placed him into the armored vehicle.

274.   At approximately 8:30 p.m. ERT members commanded the children to come outside.

275.   They came outside soon after. They were wearing their pajamas and did not have any clothing to protect them from the bitter cold.

276.   They did not have shoes on.

277.   They had to walk over rocks, and hard material.

278.   The ground was freezing cold.

279.   One or more of the children cried as they walked towards the vehicle.

280.   ERT members put the children inside of the armored vehicle. The steps leading up to the armored vehicle hurt their feet.

281.   They were terrified and scared about what happened to their parents.

282.   One child said, " I feel like I am being arrested."

283.   R.R as the eldest child was wearing a thin tank top. ERT members did not allow her to wear a sweatshirt or jacket. As a child going through puberty R.R. was being humiliated in addition to the myriad of other feelings she was experiencing.

284.   R.R. had to carry the three (3) year old.

285.   The OCSO kept the children crammed inside the armored vehicle.

286.   The armored vehicle was converted into a command center.

287.   It had a folding table and white boards where personnel communicated with the ERT members inside.

288.   There was an ominous, spent shell casing on the floor.

289.   The children could see and hear what was happening inside of Property.

290.   They could hear the ERT team searching every part of their home.

291.   The children were not brought to their parents.

292.   Yates County Sheriffs were at Property assisting.

293.   At some point Mrs. Rutsch passed out in a police cruiser.

294.   Mrs. Rutsch tried to tell the police numerous times that she needed emergency assistance.

295.   No one listened.

296.   Mrs. Rutsch's minor child F.R observed her hunched over in the police vehicle.

297.   F.R believed that she was dead.

298.   ERT members threw at least three (3) Flashbangs in Property.

299.   There was absolutely no basis for them to believe that anyone was inside Property.

300.   They threw one Flashbang grenade into a hallway that was visibly empty.

301.   ERT members damaged the hallway floor with Flashbang.

302.   Mrs. Rutsch's dog was inside the hallway.

303.   ERT members searched parts of a ceiling sealed from the outside.

304.   ERT members searched through the children's rooms, under their beds, and in cabinets.

305.   ERT members had a drone with them.

306.   ERT members searched in places no human being could hide such as a washer machine.

307.   ERT members destroyed blinds in the basement.

308.   ERT members entered and searched the detached building Bowerman called the "she shed."

309.   ERT members broke the lock on a maintenance shed detached from Property and entered it.

310.   OCSO held Plaintiffs in custody for over two hours.

311.   OSCO eventually let R.R. and F.R. leave with Andrew  and the other children leave with Ms. Spicer.

312.   Defendants searched Plaintiffs Sharon Rutsch, Andrew Spicer, R.R., and F.R's entire home twice.

313.   Defendants searched the garage, vehicles in the garage, Mrs. Rutsch's meditation shed, and a utility shed.

314.   Defendants seized Mrs. Rutsch's lawfully owned Sig-Sauer.

315.   Defendants seized ammunition and a  pistol holder.

316.   Defendants released Mrs. Rutsch after they concluded their search.


***SPACE INTENTIONALLY LEFT BLANK***

## AS AND FOR A FIRST CAUSE OF ACTION
### -Against Defendant Bowerman-
## VIOLATION OF THE FOURTH AMENDMENT[1]
## AND N.Y. CONST ART I SECTION XII
[reckless disregard for the truth]
## PURSUANT TO 42 U.S.C. §1983

1. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

2. Under the Fourth Amendment "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

3. 42 U.S.C. §1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

4. At all times referenced herein, Defendant Bowerman, acted under color of law pursuant to, and in his capacity, as an investigator working in the Ontario County Sheriff's Office's criminal investigations bureau.

---

[1] Every claim herein alleging violations of the Fourth Amendment also allege violations of New York State's counterpart, as set forth in the New York State Constitution Article I, section XII. References to the State Constitution are purposefully omitted below for stylistics purposes related to pleadings, such as promoting clarity and avoiding duplication and redundancy.

5. At all times herein Bowerman deprived Mrs. Rutsch of her Fourth Amendment rights.

6. Bowerman failed to take basic investigative steps that an officer in an analogous situation would have reasonably taken.

7. Bowerman violated clearly established federal law.

8. Bowerman recklessly investigated the allegations against Mrs. Rutsch.

9. Bowerman unreasonably disregarded circumstances that should have given him pause to accept Lohnes' allegations uncritically.

10. Lohnes demeanor was entirely inconsistent with a victim of a crime. Her demeanor and cackling spoke volumes. But Bowerman ignored what was in front of him.

11. Lohnes recitation of events is laden with inconsistencies and contradictions.

12. Lohnes claimed that she went to a gas station first to speak with Rutsch in a public setting and that Rutsch allegedly told Lohnes that she was going to kick her ass if she went to Property.

13. Bowerman ignored that Lohnes' explanation of how she was invited to Property made no sense and was not supported by the text messages she claimed showed the invitation.

14. These facts belie the open, friendly invitation portrayed by Bowerman in his affidavit.

15. Bowerman ignored evidence that Lohnes was trespassing.

16. Bowerman disregarded that Lohnes had ample motive to falsify her claims as a means of retaliation.

17. Bowerman did not ask Lohnes follow up questions.

18. Bowerman recklessly disregarded factual impossibilities.

19. Lohnes' injuries were consistent with a fight. None of her injuries could plausibly be caused by blunt force trauma from a handgun.

20. Someone who gets "smashed" in the nose with a handgun would—at a minimum—have more than slight bruising on his or her nose.

21. Bowerman recklessly disregarded salient facts and deductions that—at a minimum—showed Lohnes was not being honest.

22. Bowerman recklessly disregarded salient facts and deductions that no crime occurred.

23. Lohnes delayed reporting the alleged incident until the afternoon of the following day.

24. Lohnes said she went to a hospital immediately after the fight and told the staff there that she was injured in a fight. She did not mention a firearm.

25. Lohnes had the car window down in the coldest month of the year.

26. Lohnes did not call the police or leave Property when Mrs. Rutsch allegedly threatened Lohnes and went inside Property to allegedly retrieve a handgun.

27. Lohnes did not know what part of the handgun she was allegedly hit with.

28. Lohnes claimed to remember specific words exchanged between Lohnes and Mrs. Rutsch however, when Lohnes claims Mrs. Rutsch allegedly hit Lohnes in the car.

29. Lohnes "forgot" material parts of what she claimed occurred, such as Mrs. Rutsch pointing a gun at her upon exiting Property.

30. Lohnes never claimed that Mrs. Rutsch unlawfully possessed a handgun.

31. Lohnes necessarily implied that Mrs. Rutsch lawfully owned a handgun.

32. But Lohnes described a handgun that Mrs. Rutsch did not own.

33. Lohnes knew Mrs. Rutsch lawfully owned a handgun and therefore could easily make up allegations that Mrs. Rutsch used a handgun to strike Lohnes.

34. Bowerman recklessly disregarded a plethora of facts—such as the ones above— that would have given pause to a similarly situated law enforcement agent to accept Lohnes' allegations uncritically.

35. Bowerman recklessly disregarded salient facts—as pleaded herein—which nullify probable cause to believe that Mrs. Rutsch committed a crime.

36. Bowerman recklessly ignored the crescent shaped laceration.

37. Bowerman recklessly ignored the absence of any marks or impression of a handgun on Lohnes' face.

38. He recklessly disregarded that Mrs. Rutsch tried to end the conflict through talking but Lohnes erupted in gut wrenching laughter in response instead of leaving Mrs. Rutsch's property. Lohnes refused to leave and continued to fight.

39. Under the circumstances it was unreasonable to not speak with Mrs. Rutsch.

40. Under the circumstances, it was unreasonable not to interview Andrew Spicer.

41. Had Bowerman spoken with Mrs. Rutsch for example, he would have known that Lohnes was bleeding prior to leaving Property. Bowerman would have seen the

plywood outside of Property with blood on it. This evidence is objectively irreconcilable with Lohnes' statement that she began to bleed when Mrs. Rutsch allegedly hit her while she was in the car.

42. Bowerman would have also seen that Mrs. Rutsch had multiple contusions.

43. Bowerman would have seen the crescent moon on Mrs. Rutsch's bracelet.

44. Defendant Bowerman recklessly disregarded the truth in the search warrant affidavit.

45. Bowerman misrepresented and omitted material facts in almost every single relevant paragraph.

46. Bowerman fabricated material facts regarding LSD and cocaine.

47. Bowerman recklessly and unreasonably contorted Lohnes statements to appear credible, cohesive, and cogent.

48. Bowerman's averment for instance, that Lohnes described the handgun as a "black glock [*sic*] styled handgun is false and misleading. The fabrication makes it appear that Lohnes was able to recall events with detail and precision. This bolsters her credibility, and by extension would justify Bowerman's unfettered reliance on Lohnes' allegations.

49. Bowerman's affidavit is facially false, misleading, and inaccurate.

50. Bowerman's reckless disregard for the truth directly and proximately, caused the deprivation of Plaintiffs' Fourth Amendment rights.

51. Bowerman reckless disregard for the truth was in abrogation of clearly established federal and State law.

52. Alternatively, Bowerman purposefully falsified material aspects of the affidavit.

AS AND FOR A SECOND CAUSE OF ACTION
VIOLATION OF THE FOURTH AMENDMENT
[affidavit does not establish probable cause]
PURSUANT TO 42 U.S.C §1983

53. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

54. A search warrant must be supported by a reasonable belief that an offense has been or is being committed, or that evidence of criminality may be found in a certain place. *People v Schiavo*, 162 AD2d 639 [2d Dept 1990].

55. Probable cause requires an officer to have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti,* 202 F.3d 625, 634 [2d Cir.2000].

56. When the informant is an alleged victim or eyewitness probable cause is defeated when the circumstances raise doubt as to the persons veracity. *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 [2d Cir.1995].

57. Penal Law(PL) section 120.05(2) (Assault In the Second Degree) provides A person is guilty of assault in the second degree when: "With intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

58. Defendant Bowerman did not have trustworthy, reasonable information that Mrs. Rutsch committed assault in the second degree.

59. The circumstances raised such serious doubts as to Lohnes' veracity, that probable cause could not exist.

60. Defendant Bowerman lacked probable cause to believe that evidence of the alleged assault—albeit a black Glock—would be found in Property.

61. Alternatively, and in addition to, Bowerman's material omissions and misstatements artificially created probable cause where it did not exist.

62. PL §265.03(Criminal Possession of a Weapon in the Second Degree) provides:

> i. A person is guilty of criminal possession of a weapon in the second degree when:

> (1) with intent to use the same unlawfully against another, such person: (a) possesses a machine gun; or (b) possesses a loaded firearm; or (c) possesses a disguised gun; or (2) Such person possesses five or more firearms, or such person possesses any loaded firearm. Such possession shall not, except as provided in subdivision one or seven of section 265.02 of this article, constitute a violation of this subdivision if such possession takes place in such person's home or place of business.

63. The affidavit contains no facts in which probable cause for this crime could support the issuance of a warrant.

64. There is no affirmation the affidavit that Mrs. Rutsch possessed a loaded firearm.

65. Alternatively, even if there was, it is not a crime since Mrs. Rutsch possessed it lawfully in her home.

66. Probable cause is devoid for this suspected crime.

67. PL §120.14 (Menacing in the Second Degree) provided in relevant part: "(1) that a person is guilty of this crime when he or she intentionally places another person in

reasonable fear of physical injury, serious physical injury, or death by displaying a deadly weapon . . . or what appears to be a pistol . . ."

68. Probable does not lie here primarily because Lohnes was not in reasonable fear.

69. Alternatively, the lack of probable cause that a crime even occurred vitiates probable cause to support a search warrant.

70. PL§220.03 (criminal possession of a controlled substance in the 7th degree) provide that a person is guilty of this crime when he or she "knowingly and unlawfully possesses a controlled substance."

71. Since Bowerman completely fabricated allegations of possession, probable cause is void *ab initio* (from the beginning).

72. Defendants deprived Plaintiffs' of their rights secured by the Fourth Amendment.

73. The lack of probable cause is so apparent that Defendant ERT Officer should have known it was absent.

74. Defendants Bowerman and ERT Officer directly and proximately deprived Plaintiffs' of their rights under the Fourth Amendment.

AS AND FOR A THIRD CAUSE OF ACTION
VIOLATION OF THE FOURTH AMENDMENT
[proscription against general warrants]
<u>PURSUANT TO 42 U.S.C. §1983</u>

75. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

76. The Fourth Amendment requires that "...no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

77. The proscription against general warrants is safeguarded by the particularity requirement in the Fourth Amendment. *Payton v. New York,* 445 U.S. 573 [1980].

78. When the items to be seized are not described with as much particularity as reasonably allowed under the circumstances the Fourth Amendment is violated. *United States v. George,* 975 F.2d 72, [2d. Circ. 1992].

79. A warrant must describe the items to be seized considering their relation to designated crimes. *United States v. Galphin,* 720 F.3d 436 [2d Circ. 2013].

80. New York State Criminal Procedure Law(CPL) section 690.10 further provides that property may be seized subject to a search warrant only where there is reasonable cause to believe that the property is stolen, unlawfully possessed, or is evidence of a crime.

81. The search warrant does not describe the items to be seized with particularity.

82.  The search warrant does not describe the alleged black, Glock handgun.

83. Instead, it authorizes the search and seizure of "handguns, magazines, ammunition, holsters, and other peripheral property associated with the possession and ownership of a handgun."

84. This is unconstitutionally overbroad.

85. There was no reasonable cause to believe that these items were evidence of the crimes listed in the search warrant.

86. There is no probable cause to believe that these items were stolen or unlawfully possessed.

87. These items have no nexus to the averments in Defendant Bowerman's affidavit.

88. The warrant authorized the defendants to search for "drugs including but not limited to LSD and cocaine" and "bloody clothing, shoes, or other personal property."

89. The warrant gave the defendant's unbridled discretion to search Property.

90. The search warrant is in all material respects a 'general warrant.'

91. It is presumptively unreasonable.

92. Nothing on the face of the warrant provides any limitation or oversight to the kind of evidence sought.

93. No reasonable police officer would believe that the search warrant was valid.

94. Defendants Bowerman and ERT Officer violated clearly established law by procuring and executing, respectively, a general search warrant.

95. Defendants Bowerman and ERT Officer directly and proximately deprived Plaintiffs Sharon Rutsch, R.R., F.R. and Plaintiff Andrew Spicer of their rights under the Fourth Amendment.

## AS AND FOR A FOURTH CAUSE OF ACTION
## VIOLATION OF THE FOURTH AMENDMENT
[unreasonable and excessive show of force]
## PURSUANT TO 42 U.S.C. §1983

96. Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

97. The level of force used by law enforcement must be reasonable and proportionate under the circumstances.

98. Law enforcement must utilize the minimum amount—or least intrusive— of force necessary to assure an officer's safety. *People v. Torres,* 74. N.Y.2d 224, [1989].

99. Defendants conducted was nothing short of a military raid upon an average American household.

100. Bowerman knew that Mrs. Rutsch resided at Property with two minor children.

101. Bowerman knew that Mr. Rutsch would not be at Property for an indefinite period.

102. Mrs. Rutsch had no criminal record.

103. Members of the OCSO conducted surveillance of Property on February 22, 2022.

104. Said members did not observe anything in which ERT intervention would be required.

105. Property is the epitome of a rural American household.

106. Defendants' lacked probable cause to believe that they would be met with resistance.

107. Members of of the Ontario County Emergency Response Team (ERT) effectuated a search of Property.

108. ERT members were heavily armed with military weapons and tactical gear.

109. ERT members were in a military vehicle built to withstand armor piercing bullets.

110. Said vehicle had an opening to mount a machine gun.

111. ERT members blinded Plaintiff's Rutsch and Abigail Spicer with tactical lights.

112. ERT members aimed assault rifles at said Plaintiffs.

113.   ERT members threw multiple flashbang grenades into Property.

114.   ERT members physically seized Plaintiffs.

115.   ERT's show of force was unreasonable under the circumstances thereby violating Plaintiffs' Fourth Amendment rights.

AS AND FOR A FIFTH CAUSE OF ACTION
VIOLATION OF THE FOURTH AMENDMENT
[unlawful search and seizure- Abigail Spicer]
PURSUANT TO 42 U.S.C. §1983

116.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

117.   Police officers must have probable cause that a crime has been or is being committed to significantly interfere with an individual's liberty of movement.

118.   A less intrusive stop—or brief detention for questioning—must be supported by reasonable suspicion that a crime has been, is being, or is going to be committed. *People v. Debour,* 40 N.Y.2d 210 [1976].

119.   In New York State police officers must have independent knowledge or reasonable suspicion that a person is armed or poses a threat to safety for a frisk to be authorized. *People v. Diaz,* 81 N.Y.2d 106 [1993].

120.   A seizure occurs when an officer restrains an individual's liberty through a show of force or physical force. *Florida v. Bostick,* 501 U.S. 429 [1991].

121.   ERT members seized Abigail Spicer when they commanded her to put her hands up and walk to the vehicle.

122.   ERT members frisked Abigail Spicer without reasonable suspicion.

123.   ERT members searched Abigail Spicer without probable cause.

124.    ERT members detained Abigail Spicer without probable cause.

125.    Defendants conduct deprived Ms. Spicer of her rights under the Fourth Amendment.

### AS AND FOR A SIXTH CAUSE OF ACTION
### VIOLATION OF THE FOURTH AMENDMENT
[unlawful search and seizure- Andrew Spicer]
### PURSUANT TO 42 U.S.C. §1983

126.    Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

127.    ERT members seized Andrew Spicer when they commanded him to slowly come outside of Property and to walk backwards towards their vehicle.

128.    ERT members frisked Andrew Spicer without reasonable suspicion.

129.    ERT members searched Andrew Spicer without probable cause.

130.    ERT members detained Andrew Spicer without probable cause.

131.    Defendants conduct deprived Mr. Spicer of his rights under the Fourth Amendment.

### AS AND FOR A SEVENTH CAUSE OF ACTION
### VIOLATION OF THE FOURTH AMENDMENT
[unlawful seizure-R.R.]
### PURSUANT TO 42 U.S.C. §1983

132.    Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

133.    ERT members seized R.R.

134.    ERT members detained R.R for an unreasonable amount of time.

135.    ERT did not have probable cause or reasonable suspicion to detain R.R.

136.    Defendants did not permit R.R. to leave.

137.   Defendants caused R.R. to experience embarrassment, humiliation, fear, anxiety, pain, and suffering.

138.   Defendants conduct deprived R.R. of R.R.'s rights under the Fourth Amendment.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### VIOLATION OF THE FOURTH AMENDMENT
### [unlawful seizure- F.R.]
### PURSUANT TO 42 U.S.C. §1983

139.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

140.   ERT members seized F.R.

141.   ERT members detained F.R for an unreasonable amount of time.

142.   ERT did not have probable cause or reasonable suspicion to detain F.R.

143.   F.R saw F.R.'s mother, Sharon Rutsch, slumped over in a police vehicle.

144.   Defendants did not permit F.R. to speak with Mrs. Rutsch.

145.   Defendants did not permit F.R. to leave.

146.   Defendants caused F.R. to experience fear, anxiety, pain, and suffering.

147.   Defendants conduct deprived F.R. of F.R.'s rights under the Fourth Amendment.

### AS AND FOR A NINTH CAUSE OF ACTION
### VIOLATION OF THE FOURTH AMENDMENT
### [unlawful seizure-H.Z.]
### PURSUANT TO 42 U.S.C. §1983

148.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

149.   ERT members seized H.Z.

150.   ERT members detained H.Z. without probable cause or reasonable suspicion.

151.   ERT members detained H.Z. for an unreasonable amount of time.

152.   Defendants conduct violated H.Z.'s Fourth Amendment rights.

153.   Defendants conduct caused H.Z. to suffer from fear, anxiety, and terror.

AS AND FOR A TENTH CAUSE OF ACTION
VIOLATION OF THE FOURTH AMENDMENT
[unlawful seizure-M.Z.]
PURSUANT TO 42 U.S.C. §1983

154.   Plaintiffs repeat and re-allege every allegation above as though fully set forth

herein.

155.   ERT members seized M.Z.

156.   ERT members detained M.Z. without probable cause or reasonable suspicion.

157.   ERT members detained M.Z. for an unreasonable amount of time.

158.   Defendants conduct violated M.Z.'s Fourth Amendment rights.

159.   Defendants conduct caused M.Z. to suffer from fear, anxiety, and terror.

AS AND FOR AN ELEVENTH CAUSE OF ACTION
VIOLATION OF THE FOURTH AMENDMENT
[unlawful seizure-R.Z.]
PURSUANT TO 42 U.S.C. §1983

160.   Plaintiffs repeat and re-allege every allegation above as though fully set forth

herein.

161.   ERT members seized R.Z.

162.   ERT members detained R.Z. without probable cause or reasonable suspicion.

163.   ERT members detained R.Z. for an unreasonable amount of time.

164.   Defendants conduct violated R.Z.'s Fourth Amendment rights.

165.   Defendants conduct caused R.Z. to suffer from fear, anxiety, and terror.

AS AND FOR A TWELFTH CAUSE OF ACTION
VIOLATION OF THE FOURTH AMENDMENT
[unlawful search and seizure-Sharon Rutsch]
PURSUANT TO 42 U.S.C. §1983

166.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

167.   ERT members seized Mrs. Rutsch when they commanded her to walk towards their vehicle.

168.   ERT Officer did not know why ERT was there or what they were there for.

169.   ERT Officer claimed that he was just there to execute a warrant.

170.   ERT Officer was combative and abrasive.

171.   Mrs. Rutsch was simply trying to understand what was happening.

172.   Mrs. Rutsch was in shock.

173.   ERT Officer exacerbated the situation.

174.   ERT Officer handcuffed Mrs. Rutsch.

175.   ERT Officer did not have probable cause to physically restrain Mrs. Rutsch for approximately three hours.

176.   ERT Officer left Mrs. Rutsch in a police vehicle where she lost consciousness for an unknown amount of time.

177.   ERT Officer did not provide medical assistance.

178.   ERT Officer separated Mrs. Rutsch from her children without a basis and for an unreasonable amount of time.

179.   ERT Officer unlawfully searched Property.

180.   ERT Officer unlawfully searched two enclosed outbuildings next to, and on Property.

181.   ERT Officer violated Mrs. Rutsch's rights under the Fourth Amendment.

182.   Defendants caused the deprivation of Mrs. Rutsch's rights.

183.   Defendants proximately caused Mrs. Rutsch to experience post traumatic stress disorder, anxiety, depression, fear of law enforcement, and pain and suffering, and other damages yet to be ascertained.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
## VIOLATION OF THE FOURTH AMENDMENT
### [unlawful search-Drone]
### PURSUANT TO 42 U.S.C. §1983

184.   Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

185.   Defendant OCSO had two if its members fly a drone above and around Property approximately at 1:30 p.m.

186.   The drone took recordings of areas inside Property that were not visible from public property.

187.   The drone's recordings constituted a search.

188.   Said members did not have probable cause to search Property.

189.    Defendant OSCO deprived Plaintiffs' Rutsch, her minor children, and Andrew

Spicer of their rights under the Fourth Amendment.

AS AND FOR A FOURTEENTH CAUSE OF ACTION
VIOLATION OF THE FOURTH & SECOND AMENDMENT
[unlawful seizure-lawfully owned firearm]
PURSUANT TO 42 U.S.C. §1983

190.    Plaintiffs repeat and re-allege every allegation above as though fully set forth

herein.

191.    The Second Amendment provides that "[a] well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear Arms,

shall not be infringed."

192.    The Second Amendment has been incorporated to apply to the states through

the Fourteenth Amendment. *McDonald v. City of Chicago,* 561 U.S. 742 [2010].

193.    Plaintiff Sharon Rutsch lawfully owned a Sig-Sauer handgun with a grey/silver

barrel and slide, and black grip (Sig).

194.    Defendants unlawfully seized Mrs. Rutsch's Sig.

195.    Defendants did not have probable cause to seize Mrs. Rutsch's Sig.

196.    Defendants took Mrs. Rutsch's lawfully possessed in violation of Mrs. Rutsch's

rights under the Fourth Amendment and the Second Amendment.

AS AND FOR A FIFTEENTH CAUSE OF ACTION
VIOLATION OF THE FOURTH AMENDMENT
[unreasonable search and seizure- no knock and any time]
PURSUANT TO 42 U.S.C. §1983

197.    Plaintiffs repeat and re-allege every allegation above as though fully set forth

herein.

198.   Pursuant to CPL §690.35.4[a] a search warrant may be executed at any time if there is "reasonable cause to believe that (i) it cannot be executed between the hours of 6:00 A.M. and 9:00 P.M. or (ii) the property sought will be removed or destroyed if not seized forthwith. . . ."

199.   Defendant Bowerman affirmed that the warrant needed to be executable at any time of the day or night because of "the time it may take for planning and executing the search warrant."

200.   This statement clearly does not establish reasonable cause to believe that it could not be executed between those hours.

201.   Upon information and belief, this is standard practice for the OCSO.

202.   CPL §690.25.4[b] provides, in relevant part, that a search warrant may dispense with the requirement that the executing police officer give notice "of his authority and purpose, upon the ground that there is reasonable cause to believe that (i) the property sought may be easily and quickly destroyed or disposed of, or (ii) the giving of such notice may endanger the life or safety of the executing officer or another person . . ."

203.   Defendant Bowerman did not satisfy any of the conditions clearly expressed under CPL §690.25(4)[b].

204.   Defendant Bowerman statement that Mr. Rutsch *may* have passed along tactical training to Mrs. Rutsch is purely speculative. Bowerman did not provide the factual predicate required to secure a "no knock" warrant.

205.   ERT executed the warrant upon a defective affidavit.

206.    Defendant Bowerman unlawfully secured a no-knock warrant to be executed at any time of the day or night in contravention of the law and to Plaintiffs' detriment.

207.    Defendant Bowerman's reckless disregard for Plaintiff' caused Plaintiffs' to experience pain and suffering,  and extreme fear.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
-against Ontario County and OCSO -
VIOLATION OF THE FOURTH AMENDMENT
[failure to train]
PURSUANT TO 42 U.S.C. §1983

208.    Plaintiffs repeat and re-allege every allegation above as though fully set forth herein.

209.    Defendants Ontario County and OSCO caused the deprivations of Plaintiffs' Fourth Amendment rights through a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

210.    Alternatively, said Defendants caused the numerous deprivations enumerated above by a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware.

211.    Defendant Ontario County (OC) controlled law enforcement personnel who used an armored, military vehicle, and military weapons.

212.    Defendants OC and OCSO establish policy, procedure, training, and supervision for criminal investigators and its emergency response team.

213.   As pleaded above, ERT  recklessly used the military equipment under circumstances where such a show of force was not only unnecessary, but disproportionate with the reasonable actions of a SWAT unit executing a search warrant of a home under similar circumstances. A home with children inside it.

214.   A multitude of factors such as who owns the premise, who is expected to be there when the search warrant is executed, prior criminal convictions, evidence of ongoing criminal activity, evidence that the police will encounter resistance, the threat of danger etc., must be considered before executing a search warrant. ERT did not consider any of these—and other— salient factors.

215.   The numerous facts pleaded herein establish that OC has the equivalent of a standing army. OC is responsible for training ERT members to lawfully and reasonably use weapons and equipment made for war, on American soil.

216.   OC did not adequately train or supervise ERT members as to appropriate use of force under the circumstances presented here, and the prevailing law regarding searches and seizures.

217.   OC has not trained ERT members to be familiar with the scope in which they may lawfully act, and the legal limitations specifying the instances when they are restrained from acting.

218.   OC has not trained ERT to review search warrant affidavits and search warrants.

219.   ERT members blindly act as a blunt instrument irrespective of the circumstances, or whether their conduct violates the prohibition against unreasonable searches and seizures.

220.   OC knew that ERT members used military equipment to execute search warrants like the one here.

221.   OC's failure to adequately train the ERT constitutes a reckless disregard for Plaintiffs Fourth Amendment rights.

222.   Alternatively, said Defendants caused the numerous deprivations enumerated above by a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware.

223.   OC knew that criminal investigators routinely apply for search warrants in the course of investigating criminal accusations and criminal conduct.

224.   Defendant Bowerman's conduct—as pleaded herein—demonstrates a systemic pattern of applying for and executing search warrants based on legally defective grounds and/or evidence insufficient to establish probable cause.

225.   OC and OCSO maintain statistics regarding crime and law enforcement actions—such as the number and type of warrants obtained and executed, types of evidence seized and other data.

226.   Said Defendants evaluate and review search warrant affidavits and evidence in the course of its law enforcement activities.

227.   Based on information and belief, Defendant Bowerman and the criminal investigations unit routinely apply for search warrants based on legally deficient grounds. The practice is widespread.

228.   Based on information and belief, the majority of the search warrants applied for are issued.

229.   OC and OCSO must have been aware of this practice because it is widespread and contained within documents and data it reviews.

230.   Defendants caused the numerous deprivations enumerated above and as related to applying for search warrants by a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policymaker must have been aware

RELIEF REQUESTED

231.   Under the first cause of action Plaintiffs seek:

      i.   Monetary Damages.

      ii.   Punitive Damages.

232.   Under the second cause of action Plaintiffs seek:

      i.   Monetary Damages.

233.   Under the third cause of action Plaintiffs seek:

      i.   Monetary Damages.

234.   Under the fourth cause of action Plaintiffs seek:

      i.   Monetary Damages.

235.  Under the fifth cause of action Plaintiffs seek:

      i.  Monetary Damages.

236.  Under the sixth cause of action Plaintiffs seek:

      i.  Monetary Damages.

237.  Under the seventh cause of action Plaintiffs seek:

      i.  Monetary Damages.

238.  Under the eighth cause of action Plaintiffs seek:

      i.  Monetary Damages.

239.  Under the ninth cause of action Plaintiffs seek:

      i.  Monetary Damages.

240.  Under the tenth cause of action Plaintiffs seek:

      i.  Monetary Damages.

241.  Under the eleventh cause of action Plaintiffs seek:

      i.  Monetary Damages.

242.  Under the twelfth cause of action Plaintiffs seek:

      i.  Monetary Damages.

243.  Under the thirteenth cause of action Plaintiffs seek:

      i.  Monetary Damages.

244.  Under the fourteenth cause of action Plaintiffs seek:

      i.  Monetary Damages.

245.  Under the fifteenth cause of action Plaintiffs seek:

      i.  Monetary Damages.

246.   Under the sixteenth cause of action Plaintiffs seek:

      i.   Monetary Damages.

     ii.   Punitive Damages.

   iii.   Proper training protocols.

247.   Plaintiffs also seek attorneys fees and costs.

CERTIFICATION & CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of

my knowledge, information, and belief that this complaint: (1) is not being presented for

an improper purpose, such as to harass, cause unnecessary delay, or needlessly

increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous

argument for extending, modifying, or reversing existing law; (3) the factual

contentions have evidentiary support or, if specifically so identified, will likely have

evidentiary support after a reasonable opportunity for further investigation or

discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Dated:   August 29, 2022
         Hauppauge, NY

                              Respectfully Submitted,

                              _____
                              LAW OFFICE OF CHAD J. LAVEGLIA
                              CHAD J. LAVEGLIA ESQ.,
                              *Attorneys for Plaintiffs*
                              350 Motor Parkway, #308
                              Hauppauge, NY 11788
                              (631) 450-2468
                              claveglia@cjLLaw.org