UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHARON RUTSCH, *as p/n/g of* R.R., F.R.,
*and on behalf of herself,* ABIGAIL SPICER,
*as p/n/g of* H.Z., M.Z., R.Z., *and on behalf of herself,*
and ANDREW SPICER,

                         Plaintiffs,

           v.

ONTARIO COUNTY,
INVESTIGATOR NATHAN BOWERMAN,
*in his personal capacity,* SHERIFF PHILIP POVERO,
*in his personal capacity,* KEITH GREEN, *in his personal
capacity,* MICHAEL GREGARIO, TATE COLBURN,
ZACHARY HUDGINS, and SAMUEL COLBURN,

                         Defendants.
_____

**DECISION AND ORDER**

6:22-CV-06369 EAW

## **INTRODUCTION**

Plaintiffs Sharon Rutsch, Abigail Spicer, and Andrew Spicer, on behalf of themselves and minor children R.R., F.R., H.Z., M.Z., and R.Z. (collectively, "Plaintiffs"), bring this action pursuant to 42 U.S.C. § 1983 against Ontario County, Investigator Nathan Bowerman, Sheriff Philip Povero, Keith Green, Michael Gregario, Tate Colburn, Zachary Hudgins, and Samuel Colburn (collectively, "Defendants"). (Dkt. 35). Plaintiffs allege that Defendants violated their rights under the Second and Fourth Amendments of the United States Constitution, as well as Article I, § 12 of the New York State Constitution. (*Id.*).

Pending before the Court is Defendants' motion for summary judgment. (Dkt. 53). For the following reasons, Defendants' motion is granted.

## **BACKGROUND**

The following background is taken from Defendants' Local Rule 56 Statement of Material Facts (Dkt. 53-1), Plaintiffs' Local Rule 56(a)(2) Opposing Statement (Dkt. 58-1), and the exhibits the parties submitted. Unless otherwise noted, these facts are undisputed.

On February 22, 2022, Deputy Tyler Brooks-Lambert of the Ontario County Sheriff's Department interviewed Michelle Lohnes at her home regarding an alleged assault that had occurred the day before. (Dkt. 53-1 at ¶ 1; Dkt. 58-1 at ¶ 1). According to Lohnes, Plaintiff Sharon Rutsch had struck her in the face with a handgun while Lohnes was on Rutsch's property. (*See* Dkt. 53-1 at ¶¶ 2-3; Dkt. 58-1 at ¶¶ 2-3). Lohnes also told Deputy Brooks-Lambert that there was marijuana and potentially other controlled substances—LSD and cocaine—on Rutsch's property. (Dkt. 53-1 at ¶ 5; Dkt. 58-1 at ¶ 5; *see* Dkt. 53-14 at 09:45-11:05 (footage from Deputy Brooks-Lambert's body worn camera ("BWC"))).[1]

---

[1]    Both parties rely on the BWC footage submitted by Defendants in support of their motion for summary judgment and no party disputes its accuracy. (*See, e.g.*, Dkt. 53-1 at ¶ 5; Dkt. 58-1 at ¶ 5). When a videotape of the relevant events exists and there are no disputes about its accuracy, a court deciding a motion for summary judgment must "view[ ] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007); *see also Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on . . . [a motion for judgment as a matter of law] if it so utterly discredits the opposing party's version that no reasonable juror could

Defendants Investigator Samuel Colburn and Investigator Nathan Bowerman arrived at Lohnes' home. (Dkt. 53-1 at ¶ 9; Dkt. 58-1 at ¶ 9). Investigator Colburn photographed Lohnes' injuries, and Deputy Brooks-Lambert obtained Lohnes' supporting deposition. (Dkt. 53-1 at ¶ 12; Dkt. 58-1 ¶ 12; Dkt. 53-28 (copy of Lohnes' supporting deposition); Dkt. 53-33 (copies of photographs taken by Investigator Colburn of Lohnes' injuries)). In her supporting deposition, Lohnes recounted many of the same alleged facts that she first told Deputy Brooks-Lambert. (Dkt. 53-1 at ¶¶ 12-14; Dkt 58-1 at ¶¶ 12-14; see Dkt. 53-28 at 2). But she did not mention the possible presence of LSD and cocaine again. (See id.).

Investigator Bowerman was in the room off and on while Deputy Brooks-Lambert obtained Lohnes' supporting deposition. (Dkt. 53-1 at ¶ 12; Dkt. 58-1 at ¶ 12). He found Lohnes generally credible and observed injuries to her face that he believed were consistent with being struck by a handgun.[2] (See Dkt. 53-1 at ¶¶ 15-18; Dkt. 58-1 at ¶¶ 15-18; see also Dkt. 53-5 at 10, 12-13, 34-35, 40-42, 46-52, 64 (portions of Investigator Bowerman's deposition transcript)).

After obtaining Lohnes' supporting deposition, Deputy Brooks-Lambert showed it to Investigator Bowerman. (Dkt. 53-1 at ¶ 21; Dkt. 58-1 at ¶ 21). Investigator Bowerman and Investigator Colburn then traveled to Rutsch's property, located at 4850 Townline

---

fail to believe the version advanced by the moving party."). The references here to the events reflected in the BWC footage are based on the Court's review of that footage.

[2]    Plaintiffs disagree whether Lohnes' facial injuries were, in fact, consistent with being struck by a handgun, as they assert that "Lohnes was never hit with a handgun." (See Dkt. 58-1 at ¶¶ 14-18).

Road in Gorham, New York, and took photographs of the property. (Dkt. 53-1 at ¶ 23; Dkt. 58-1 at ¶ 23; *see* Dkt. 53-5 at 15-16). Investigator Bowerman then applied for a warrant to search Rutsch's property. (Dkt. 53-1 at ¶ 35; Dkt. 58-1 at ¶ 35; *see* Dkt. 53-27 (copy of Investigator Bowerman's affidavit for the search warrant application)).

Investigator Bowerman's application sought to search Rutsch's property for evidence related to the offenses of: (1) assault in the second degree;[3] (2) criminal possession of a weapon in the second degree;[4] (3) menacing in the second degree;[5] and (4) criminal possession of a controlled substance in the seventh degree.[6] (Dkt. 53-27 at 4; *see* Dkt. 53-1 at ¶ 36; Dkt. 58-1 at ¶ 36). The application further sought to recover the

---

[3]    "A person is guilty of assault in the second degree when . . . [w]ith intent to cause physical injury to another person, he [or she] causes such injury to such person . . . by means of a deadly weapon." N.Y. Penal Law § 120.05(2). "'Deadly weapon' means any loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged," *id.* § 10.00(13), and "[a] gun that is used as a bludgeon is readily capable of causing death or other serious physical injury," *People v. Wooden*, 275 A.D.2d 935, 935 (4th Dep't 2000) (internal quotation marks and citation omitted).

[4]    "A person is guilty of criminal possession of a weapon in the second degree when . . . with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm." N.Y. Penal Law § 265.03(1)(b).

[5]    "A person is guilty of menacing in the second degree when . . . [h]e or she intentionally places or attempts to place another person in reasonable fear of physical injury, serious physical injury or death by displaying . . . what appears to be a pistol." N.Y. Penal Law § 120.14(1).

[6]    "A person is guilty of criminal possession of a controlled substance in the seventh degree when he or she knowingly and unlawfully possesses a controlled substance." N.Y. Penal Law § 220.03. A "controlled substance" is "any substance listed in schedule I, II, III, IV or V of section thirty-three hundred six of the public health law." *Id.* § 220.00(5). Lysergic acid diethylamide—commonly referred to as "LSD" or "acid"—is a schedule I controlled substance, N.Y. Pub. Health Law § 3306(1)(d)(12), while cocaine is a schedule II controlled substance, *id.* § 3306(2)(b)(4).

following types of evidence: (1) "[h]andguns, magazines, holsters and other peripheral property associated with the possession and ownership of a handgun"; (2) "[d]rugs including but not limited to LSD and cocaine"; and (3) "[b]loody clothing, shoes or other personal property." (Dkt. 53-27 at 4; *see* Dkt. 53-1 at ¶ 36; Dkt. 58-1 at ¶ 36). The Honorable Frederick G. Reed granted Investigator Bowerman's application. (Dkt. 53-1 at ¶ 35; Dkt. 58-1 at ¶ 35; *see* Dkt. 53-29 (copy of search warrant issued by Judge Reed on February 22, 2022)).

Defendant Lieutenant Keith Green—commander of the Ontario County SWAT[7] team—approved the use of his team to execute the search warrant. (Dkt. 53-1 at ¶¶ 45-47; Dkt. 58-1 at ¶¶ 45-47; *see* Dkt. 53-6 at 14 (portion of Lieutenant Green's deposition)). Lieutenant Green then briefed Defendant Sheriff Philip Povero and instructed his team to formulate an entry plan. (Dkt. 53-1 at ¶ 48; Dkt. 58-1 at ¶ 48; *see* Dkt. 53-6 at 14-15). Lieutenant Green approved his team's entry plan. (Dkt. 53-1 at ¶ 48; Dkt. 58-1 at ¶ 48; *see* Dkt. 53-56 (copy of team's entry plan)).

At 7:59 p.m., Lieutenant Green's team executed the search warrant on Rutsch's property. (Dkt. 53-1 at ¶¶ 54, 58; Dkt. 58-1 at ¶¶ 54, 58). Defendant Sergeant Michael Gregorio was team lead, and Defendant Lieutenant Tate Colburn was the team's emergency vehicle operator. (*Id.*; *see* Dkt. 53-7 at 8 (portion of Sergeant Gregario's deposition); Dkt. 53-8 at 23 (portion of Lieutenant Colburn's deposition)). When the team entered Rutsch's property, Deputy Brooks-Lambert announced their presence as members

---

[7]     The acronym "SWAT" stands for "Special Weapons and Tactics." *See Terebesi v. Torreso*, 764 F.3d 217, 221 n.1 (2d Cir. 2014).

of the Ontario County Sheriff's Department and that they were there to execute a search warrant. (*See* Dkt. 53-1 at ¶ 59; Dkt. 58-1 at ¶ 59). Deputy Brooks-Lambert also instructed the occupants of the home to exit slowly with their hands in the air. (*See id.*).

At that time, Plaintiff Abigail Spicer ("Abigail") and Rutsch approached the team's vehicle from an outbuilding on the property, but another individual—Plaintiff Andrew Spicer ("Andrew")—went back into the main house.[8] (*See id.*). Abigail and Rutsch initially complied with Deputy Brooks-Lambert's instructions, but Abigail then put her hands down and retrieved a cell phone from her pocket. (*See* Dkt. 53-1 at ¶ 60; Dkt. 58-1 at ¶ 60). The parties disagree whether Abigail used the cell phone to make a call or to film the officers. (*Compare* Dkt. 53-1 at ¶ 60, *with* Dkt. 58-1 at ¶ 60).

For a few minutes, the officers attempted to get Abigail and Rutsch to comply with their instructions. (*See* Dkt. 53-1 at ¶¶ 63-67; Dkt. 58-1 at ¶¶ 63-67). Eventually, Defendant Investigator Zachary Hudgins presented—but did not deploy—a taser to obtain compliance. (Dkt. 53-1 at ¶ 67; Dkt. 58-1 at ¶ 67; *see* Dkt. 53-18 at 20:50-21:30 (footage from Investigator Hudgins' BWC); Dkt. 53-39 at 4 (copy of team's immediate after-action report)). Abigail then approached the rear of the team's vehicle; Investigator Hudgins brought Abigail to the ground, and Sergeant Mark Taylor secured her with zip ties. (Dkt. 53-1 at ¶ 67; Dkt. 58-1 at ¶ 67; *see* Dkt. 53-17 at 16:00-17:30 (footage from Sergeant

---

[8]    Plaintiffs assert that Andrew was in the main house when the officers arrived (*see* Dkt. 58-1 at ¶ 59), but Lieutenant Colburn's BWC footage shows an adult male exit the outbuilding after Abigail and Rutsch and enter the main house (*see* Dkt. 53-16 at 14:45-15:25). Further, Andrew testified at his deposition that he went back into the main house when the officers first arrived. (*See* Dkt. 58-10 at 7).

Taylor's BWC); Dkt. 53-18 at 21:30-21:50).  Sergeant Taylor made sure that he could fit his finger between Abigail's wrist and the zip ties, and he allowed Abigail to move the cuff of her sweatshirt up so that the zip ties would be more comfortable.  (Dkt. 53-1 at ¶ 68; Dkt. 58-1 at ¶ 68).  He also frisked Abigail for weapons.  (*See* Dkt. 53-1 at ¶ 69; Dkt. 58-1 at ¶ 69).

Once the officers secured and frisked Abigail, they secured and frisked Rutsch.  (*See* Dkt. 53-1 at ¶¶ 70-71; Dkt. 58-1 at ¶¶ 70-71).  They then helped both women into the back of the team's vehicle, and Abigail informed them that her three children—H.Z., M.Z., and R.Z.—were in the house along with Rutsch's two children, R.R. and F.R.  (*See* Dkt. 53-1 at ¶¶ 72-73; Dkt. 58-1 at ¶¶ 72-73).  The officers also were able to confirm that Andrew was the individual they previously saw go back into the main house.  (*See* Dkt. 53-1 at ¶ 73; Dkt. 58-1 at ¶ 73).

The officers moved Abigail and Rutsch to a secure location nearby.  (Dkt. 53-1 at ¶¶ 74, 78; Dkt. 58-1 at ¶¶ 74, 78).  At 8:24 p.m., Andrew complied with the officers' instructions and exited the main house.  (*See* Dkt. 53-1 at ¶ 81; Dkt. 58-1 at ¶ 81).  Andrew entered the back of the team's vehicle, and the officers secured and frisked him.  (*See* Dkt. 53-1 at ¶ 82; Dkt. 58-1 at ¶ 82).  The officers then worked with Andrew to come up with the best way to get the children safely out of the house.  (*See* Dkt. 53-1 at ¶ 83; Dkt. 58-1 at ¶ 83).  The officers decided to call out to the oldest child, and after a few minutes, all five children exited the house.  (Dkt. 53-1 at ¶ 84; Dkt. 58-1 at ¶ 84).  The officers moved the children to a secure location nearby.  (*See* Dkt. 53-1 at ¶¶ 86-88; Dkt. 58-1 at ¶¶ 86-88).

The team then began the process of executing the search warrant. (Dkt. 53-1 at ¶ 93; Dkt. 58-1 at ¶ 93). The officers were unsure whether there were any other adults in the house,[9] so they performed another call out. (Dkt. 53-1 at ¶ 94; Dkt. 58-1 at ¶ 94). After receiving no response, the officers cleared the house, deploying three flashbangs in the process. (*See* Dkt. 53-1 at ¶¶ 95-96; Dkt. 58-1 at ¶¶ 95-96; *see also* Dkt. 53-6 at 13 (portion of Lieutenant Green's deposition describing general purpose behind deploying flashbangs); Dkt. 53-58 at 3 (copy of Lieutenant Green's final report)).

The team finished securing the house and the other buildings on Rutsch's property at approximately 10 p.m. (Dkt. 53-1 at ¶ 102; Dkt. 58-1 at ¶ 102). Around the same time, Abigail and Andrew were released to take the children to Abigail's house. (*See* Dkt. 53-1 at ¶ 107; Dkt. 58-1 at ¶ 107). Investigator Bowerman then led the search of Rutsch's property. (Dkt. 53-1 at ¶ 108; Dkt. 58-1 at ¶ 108). During the search, Investigator Bowerman and the other officers found several firearms, bloody clothing, hallucinogenic mushrooms, and cocaine.[10] (*See* Dkt. 53-1 at ¶¶ 108-09; Dkt. 58-1 at ¶¶ 108-09; *see also* Dkt. 53-30 and 53-31 (copies of photographs taken during execution of search warrant)).

---

[9]    Plaintiffs claim that the officers "knew no one else was in the house" (Dkt. 58-1 at ¶ 93), but Sergeant Taylor's BWC footage indicates that, after detaining and speaking with Andrew, the officers had some concern whether there was anyone still in the house (*see* Dkt. 53-17 at 51:00-52:30).

[10]    Plaintiffs assert that "[t]he only evidence [Investigator Bowerman and the other officers] recovered was bloody clothing consistent with a fight." (Dkt. 58-1 at ¶ 108). That assertion is belied by Investigator Bowerman's affidavit submitted by Defendants in support of their motion for summary judgment, as well as by the photographs taken during the execution of the search warrant. (*See* Dkt. 53-26 at ¶ 7; Dkt. 53-31 at 4-5).

**DISCUSSION**

## I.    <u>Summary Judgment Standard</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concerta Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted).  Specifically, the non-moving party "must come forward with specific evidence

demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.    Plaintiffs' Claims

In their third amended complaint, Plaintiffs assert sixteen claims for relief pursuant to 42 U.S.C. § 1983,[11] alleging various violations of their rights under the Second and Fourth Amendments. (*See* Dkt. 35 at ¶¶ 348-627). Plaintiffs also assert that "[e]very claim alleging violations of the Fourth Amendment also allege violations of New York State's counterpart, as set forth in the New York State Constitution Article I, [§ 12]." (*Id.* at 31 n.3).

Counts I, II, and III challenge the validity of the search warrant issued by Judge Reed. (*See id.* at ¶¶ 348-451). Count I alleges that Investigator Bowerman recklessly

---

[11]    "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 809, 816 (1985)). A plaintiff "must demonstrate that the challenged conduct was 'committed by a person acting under color of state law,' and 'deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Jie Yin v. NFTA*, 188 F. Supp. 3d 259, 268-69 (W.D.N.Y. 2016) (alteration in original) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). But a plaintiff cannot rely on a *respondeat superior* theory of liability, *see Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003), and "must directly plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution,'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

disregarded the truth when applying for the search warrant by not appropriately investigating the matter. (*Id.* at ¶¶ 348-99). Count II alleges that Investigator Bowerman, Lieutenant Green, and the members of the SWAT team executed a search warrant unsupported by probable cause. (*Id.* at ¶¶ 400-24). And Count III alleges that all Defendants executed a search warrant that lacked sufficient particularity. (*Id.* at ¶¶ 425-51).

Counts IV and XVI challenge Defendants' use of the SWAT team to execute Judge Reed's search warrant. (*See id.* at ¶¶ 452-82, 622-27). Count IV alleges that Defendants' use of the SWAT team itself constituted an unreasonable and excessive use of force. (*See id.* at ¶¶ 452-82). And Count XVI alleges, in the alternative, that Defendants' decision to deploy the SWAT team was made pursuant to an unconstitutional policy or custom of Ontario County. (*See id.* at ¶¶ 622-27).

Counts V through XII challenge Defendants' seizure of Plaintiffs' persons. (*See id.* at ¶¶ 483-589). More specifically, Counts V, VI, and XII allege that Ontario County, Lieutenant Green, and the members of the SWAT team unlawfully searched and seized Abigail, Andrew, and Rutsch. (*Id.* at ¶¶ 483-507, 567-89). And Counts VII through XI allege that Ontario County, Lieutenant Green, and the members of the SWAT team unlawfully seized R.R., F.R., H.Z., and R.Z. (*Id.* at ¶¶ 508-66).

Finally, Counts XIII, XIV, and XV challenge other various actions taken by Defendants. (*See id.* at ¶¶ 590-621). Count XIII alleges that Investigator Bowerman and Ontario County illegally used a drone to take photographs of Rutsch's property before applying for the search warrant. (*Id.* at ¶¶ 590-99). Count XIV alleges that Defendants'

seizure of Rutsch's handgun was unconstitutional.  (*Id.* at ¶¶ 600-08).  And Count XV alleges that Defendants "unlawfully secured a no-knock warrant to be executed at any time of the day or night in contravention of the law and to Plaintiffs' detriment."  (*See id.* at ¶¶ 609-21).

## III.    New York State Constitution

Defendants first seek dismissal of Plaintiffs' claims under Article I, § 12 of the New York State Constitution.  (*See* Dkt. 53-42 at 8-9).  They argue that those claims must be dismissed because Plaintiffs failed to comply with the notice of claim requirements in New York County Law § 52 and New York General Municipal Law § 50-e.  (*See id.* at 8).  Defendants also argue that § 1983 provides Plaintiffs with an adequate remedy for any Fourth Amendment violations.  (*See id.* at 9).  The Court agrees that Plaintiffs' state constitutional claims must be dismissed.

Article I, § 12 of the New York State Constitution states that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  N.Y. Const. art. I, § 12.  That provision affords "similar but in some circumstances broader protections than the Fourth Amendment to the United States Constitution."  *Davis v. City of New York*, 959 F. Supp. 2d 324, 368 (S.D.N.Y. 2013).

The New York Court of Appeals "has 'demonstrated its willingness to adopt more protective standards' under [Article I, § 12] than those that exist under the Fourth

Amendment 'when doing so best promotes predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens.'" *Id.* (quoting *People v. Torres*, 74 N.Y.2d 224, 228 (1989)). But "[o]n the other hand, New York courts will only imply a private right of action under the state constitution where no alternative remedy is available to the plaintiff." *Id.* (internal quotation marks and citation omitted). As such, "[t]o survive summary judgment, plaintiffs must at least show that they have suffered constitutional injuries under [Article I, § 12] that are not recognized under the Fourth Amendment." *Id.*

Here, Plaintiffs acknowledge that the only claims they may pursue under Article I, § 12 that are beyond the scope of § 1983 are those seeking to hold Ontario County vicariously liable based on a theory of *respondeat superior*. (*See* Dkt. 58 at 5). But such claims are subject to the notice requirements of New York County Law § 52 and New York General Municipal Law § 50-e. *See, e.g.*, *Jordan v. Cnty. of Chemung*, 264 F. Supp. 3d 497, 523-24 (W.D.N.Y. 2017). New York County Law § 52 requires:

> Any claim or notice of claim against a county for damage, injury or death, or for invasion of personal property rights, of every name and nature, and whether casual or continuing trespass or nuisance and any other claim for damages arising at law or in equity, alleged to have been caused or sustained in whole or in part by or because of any misfeasance, omission of duty, negligence, or wrongful act on the part of the county, its officers, agents, servants or employees, must be made and served in compliance with section fifty-e of the general municipal law.

N.Y. County Law § 52(1). In turn, New York General Municipal Law § 50-e requires:

> In any case founded upon tort where a notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation, as defined in the general construction law, or any officer, appointee or employee thereof, the notice of

claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises.

N.Y. Gen. Mun. Law § 50-e(1)(a). Ontario County is a "public corporation" that is entitled to notice under those provisions. *See* N.Y. Gen. Constr. Law § 66(1)-(2).

In their Local Rule 56 Statement of Material Facts, Defendants assert that Plaintiffs never "serve[d] a notice of claim, as required by New York General Municipal Law § 50-e and New York County Law § 52, on any Defendants in connection with any of the claims asserted in this action." (Dkt. 53-1 at ¶ 114; *see* Dkt. 53-3 at ¶ 15). Plaintiffs dispute that fact in their Local Rule 56(a)(2) Opposing Statement. (*See* Dkt. 58-1 at ¶ 114). But they offer no evidence. Plaintiffs' conclusory denial, which lacks support in the record, is insufficient to allow the Article I, § 12 claims to survive. *See Friel v. Cnty. of Nassau*, 947 F. Supp. 2d 239, 247 (E.D.N.Y. 2013) ("It is well settled that compliance with the notice of claim requirement is a condition precedent to commencement of an action against [a] municipality and the burden is on the plaintiff to plead and prove compliance with the notice of claim requirement.").

"Federal courts do not have jurisdiction to hear complaints from plaintiffs who have failed to comply with [New York's] notice of claim requirement[s]." *Gibson v. Comm'r of Mental Health*, No. 04 Civ. 4350(SAS), 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006); *see Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793-94 (2d Cir. 1999) (acknowledging that New York courts strictly construe notice of claim requirements and that "[f]ailure to comply with th[ose] requirements ordinarily requires a dismissal . . . ."); *Dingle v. City of New York*, 728 F. Supp. 2d 332, 348-49 (S.D.N.Y. 2010) ("Federal courts

do not have jurisdiction to hear state law claims brought by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim.").

Here, Plaintiffs have provided no evidence of their compliance with New York's notice of claim requirements, and thus the Court lacks jurisdiction over their Article I, § 12 claims. *See, e.g.*, *A.W. by E.W. v. N.Y. Dep't of Educ.*, 519 F. Supp. 3d 128, 137 (E.D.N.Y. 2021) (dismissing false imprisonment claim against the New York Department of Education for lack of jurisdiction given the plaintiff's failure to comply with General Municipal Law § 50-e). Those claims therefore are dismissed without prejudice.

## IV.    <u>Section 1983</u>

All sixteen of Plaintiffs' claims for relief implicate their rights under the Fourth Amendment. (*See* Dkt. 35 at ¶¶ 348-627). "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' and prohibits the issuance of warrants without 'probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. Jones*, 43 F.4th 94, 108 (2d Cir. 2022) (alteration in original) (quoting U.S. Const. amend. IV). "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018).

### A.    **Count I: Investigation**

Plaintiffs allege that Investigator Bowerman recklessly disregarded the truth when applying for the search warrant because he relied on Lohnes' statements to establish

probable cause. (*See* Dkt. 35 at ¶¶ 348-99). According to Plaintiffs, Lohnes clearly was not credible, so it was unreasonable for Investigator Bowerman to apply for the warrant without first speaking with Rutsch and Andrew. (*See, e.g.*, *id.* at ¶¶ 386-87). Defendants argue that "[o]nce probable cause was established, [Investigator] Bowerman had no duty to investigate exculpatory defenses or to assess the credibility of unverified claims of justification, and [he] had far less a duty to elicit and test any such defenses prior to seeking and effectuating a warrant." (Dkt. 53-42 at 13 (alteration, internal quotation marks, and citation omitted)). Defendants are correct that on this record, no reasonable jury could conclude that Investigator Bowerman had a duty to further investigate Lohnes' allegations.

"When information is received from a putative victim or eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (internal citations omitted); *see Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). "The most common situation in which such doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." *Mistretta v. Prokesch*, 5 F. Supp. 2d 129, 133 (E.D.N.Y. 1998). "When such a relationship exists, and is known to the [ ] officer . . . , the complaint alone may not constitute probable cause; the officer may need to investigate further." *Id.* "In such situations, the victim's statement need not be wholly ignored, but 'the police [must] have additional information to buttress the victim's statement.'" *Holloway v. Joseph*, No. 10-CV-6470P, 2013 WL 3816534, at *3 (W.D.N.Y. July 22, 2013) (alteration in original) (quoting *Williams v. City of New York*, No. 02

Civ.3693(CBM), 2003 WL 22434151, at *5 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 388 (2d Cir. 2005)).

Investigator Bowerman was aware of Lohnes' longstanding relationship with Rutsch when he applied for the search warrant. (*See* Dkt. 53-27 at 6 ("Lohnes stated that she has been friends with [Rutsch] for several years.")). But he also personally viewed the injuries to Lohnes' face, which he believed were consistent with being struck by a blunt object. (*See* Dkt. 53-5 at 10-14). Those visible injuries were sufficient to allow Investigator Bowerman to find Lohnes credible and to rely on her statements to establish probable cause. *See, e.g.*, *Thomas v. Cnty. of Putnam*, 262 F. Supp. 2d 241, 246-47 (S.D.N.Y. 2003) (concluding, "as a matter of law, that the sworn information before [the law enforcement officer], supported by [the officer's] observations of [the victim's] injuries, was sufficient to establish probable cause to arrest [the] plaintiff."). As such, no reasonably jury could conclude that Investigator Bowerman had a duty to further investigate Lohnes' allegations before applying for the search warrant., and Defendants therefore are entitled to summary judgment on Count I.

### B. Count II: Affidavit

Plaintiffs allege that Judge Reed's search warrant was unsupported by probable cause because Investigator Bowerman made material misstatements and omissions in his search warrant affidavit. (*See* Dkt. 35 at ¶¶ 400-24). More specifically, they assert that Investigator Bowerman "fabricated material facts regarding LSD and cocaine," as well as Lohnes' recollection of Rutsch's handgun as a "black 'glock' style handgun." (*See id.* at ¶¶ 393, 395). Plaintiffs also assert—albeit indirectly—that Investigator Bowerman

- 17 -

omitted the fact that Lohnes was trespassing on Rutsch's property at the time of the altercation.  (*See id.* at ¶ 363).  Defendants argue that, to the extent Investigator Bowerman made any material misstatements or omissions, those inaccuracies were neither intentional nor reckless.  (*See* Dkt. 53-42 at 16-19).  The Court agrees with Defendants.

"[P]robable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "Ordinarily, [a] search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause."  *Id.* at 155-56.  Similarly, "the issuance of a warrant by a neutral magistrate . . . creates a presumption that it was objectively reasonable for the officers [executing the warrant] to believe that there was probable cause."  *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).  To challenge those presumptions of reasonableness, a plaintiff "must make a 'substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was 'necessary to the finding of probable cause.'"  *Id.* (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)); *see Daniels v. City of New York*, No. 16-CV-190 (PKC)(JO), 2018 WL 4119191, at *6 (E.D.N.Y. Aug. 29, 2018) ("A Section 1983 plaintiff challenging a warrant on the ground that it deliberately or recklessly misled the issuing judge regarding the basis of probable cause 'must make the same

showing that is required at a suppression hearing' under *Franks v. Delaware* . . . ." (quoting

*Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994))).

In turn, to satisfy the state-of-mind requirement, a plaintiff must present "credible

and probative evidence that [a misstatement or] omission in a [warrant] application was

designed to mislead or was made in reckless disregard of whether it would mislead."

*United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (internal quotation marks

and citation omitted). "Reckless disregard for the truth may be established by

demonstrating that an affiant made statements which failed to take account of the facts as

he knew them, or which he seriously doubted were true." *United States v. Nejad*, 436 F.

Supp. 3d 707, 719 (S.D.N.Y. 2020) (internal quotation marks and citation omitted).

Ultimately, however, "[e]rrors contained in a search warrant affidavit caused by mere

negligence or innocent mistakes do not establish falsity or reckless disregard." *Sanders v.

City of Rochester*, 360 F. Supp. 3d 152, 162 (W.D.N.Y. 2019).

Plaintiffs assert that Investigator Bowerman "fabricated material facts regarding

LSD and cocaine." (Dkt. 35 at ¶ 393; *see id.* at ¶ 418 (claiming that Investigator Bowerman

"completely fabricated allegations of possession, [such that] probable cause [was] void *ab

initio* (from the beginning)")). Before Investigator Bowerman arrived at her home, Lohnes

informed Deputy Brooks-Lambert that Rutsch's husband, Eric, had told her that Rutsch

"had acid hidden somewhere, but [Eric] didn't know where, and [that Rutsch] was doing

coke off and on, but [Eric] was not sure whether someone [else] was bringing it [to the

house]." (Dkt. 53-14 at 10:28-10:38). But Investigator Bowerman stated in his affidavit

that Lohnes had direct knowledge of the presence of LSD and cocaine on Rutsch's property.  (*See* Dkt. 53-27 at 5).

In his deposition, Investigator Bowerman acknowledged that he based his affidavit primarily on what Lohnes had told Deputy Brooks-Lambert,[12] and that the information regarding LSD and cocaine "may have been misrelayed to [him] as far as what [Lohnes] had seen versus what she had been told."  (*See* Dkt. 53-5 at 53).  Plaintiffs do not point to any credible and probative evidence that Investigator Bowerman was aware that Lohnes did not have direct knowledge of the presence of LSD and cocaine.  *See Nejad*, 436 F. Supp. 3d at 719.  Accordingly, Investigator Bowerman's misstatement regarding the basis of Lohnes' knowledge does not invalidate Judge Reed's search warrant.

Plaintiffs also assert that Investigator Bowerman fabricated Lohnes' recollection of Rutsch's handgun to "make[] it appear that Lohnes was able to recall events with detail and precision," thereby "bolster[ing] her credibility" and "justify[ing] [Investigator] Bowerman's unfettered reliance on [her] allegations."  (*See* Dkt. 35 at ¶ 395).  Lohnes recalled in her supporting deposition that Rutsch had told Andrew during the altercation: "Grab my Glock, grab my 9 millimeter."  (*See* Dkt. 53-28 at 2 (internal quotation marks omitted)).  But Investigator Bowerman stated in his affidavit that Lohnes had recalled that "Rutsch [ ] ran inside the house and came back outside carrying what [Lohnes] described as a black 'glock' style handgun."  (Dkt. 53-27 at 5).  That inconsistency does not

---

[12]    That Investigator Bowerman based his affidavit on what Lohnes told Deputy Brooks-Lambert is of no constitutional significance.  *See Velardi*, 40 F.3d at 574 ("The observations of fellow officers are a reliable basis upon which to determine probable cause[.]" (citing *Ventresca*, 380 U.S. at 111)).

undermine the existence of probable cause. *See, e.g.*, *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993) ("[I]t cannot plausibly be contended that these minor errors or inconsistencies [in the supporting affidavits] undermine the existence of probable cause."). And again, Plaintiffs fail to point to any credible and probative evidence that Investigator Bowerman's characterization of Lohnes' recollection of Rutsch's handgun was "designed to mislead" Judge Reed. *See Rajaratnam*, 719 F.3d at 154.

Lastly, Plaintiffs assert that Investigator Bowerman omitted the fact that Lohnes was trespassing on Rutsch's property at the time of the altercation. (*See* Dkt. 35 at ¶ 363). With omissions, "[r]ecklessness is inferred when the omitted information was clearly critical to the finding of probable cause." *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014) (internal quotation marks and citation omitted). But a plaintiff must do more than show that "a reasonable person would have included the omitted information," *Rajaratnam*, 719 F.3d at 154, and "[i]ndeed, 'the mere intent to exclude information is insufficient' because '[a]n affiant cannot be expected to include every piece of information gathered in the course of an investigation,'" *United States v. Bongiovanni*, No. 19-CR-227 (JLS) (MJR), 23-CR-37 (JLS) (MJR), 2023 WL 3723265, at *3 (W.D.N.Y. May 30, 2023) (second alteration in original) (quoting *United States v. Awadallah*, 349 F.3d 42, 67-68 (2d Cir. 2003)).

Lohnes expressed concern to both Deputy Brooks-Lambert and Investigator Bowerman that Rutsch could press charges against her for trespassing. (*See* Dkt. 53-14 at 6:25-6:32; Dkt. 53-15 at 0:45-1:00). But Investigator Bowerman's deposition testimony

indicates that the possibility of Lohnes trespassing was not clearly critical to the probable cause determination:

> It was alleged that [ ] Rutsch retreated back into her home at which point she retrieved a handgun.  She was safe inside her home.  She can't come back out with a gun and threaten somebody.  She had a duty to remain in her home secure and call 911.  You can't come back out with a gun.  That's certainly an excessive amount of force for somebody that is trespassing.

(Dkt. 53-5 at 36).  Thus, there is no inference of recklessness that may be drawn from Investigator Bowerman's decision to not indicate in his affidavit the possibility that Lohnes was trespassing at the time of the altercation.  *See, e.g.*, *Rajaratnam*, 719 F.3d at 155 (acknowledging that an "inference [of recklessness] is particularly inappropriate where the government comes forward with evidence . . . that the omission was the result of a considered and reasonable judgment that the information was not necessary to the [warrant] application").

For those reasons, Plaintiffs have failed to create a genuine issue of material fact as to whether Investigator Bowerman made any material misstatements or omissions knowingly and intentionally, or with reckless disregard for the truth, and as such, Judge Reed's search warrant was supported by probable cause.[13]  *See United States v. Thomas*,

---

[13]    The Court has considered Plaintiffs' other challenges to Investigator Bowerman's affidavit, which amount to no more than a laundry list of conclusory assertions without any supporting analysis of the facts or law.  (*See, e.g.*, Dkt. 58 at 4 ("[Investigator] Bowerman stretched the facts to establish probable cause.  Lohnes never said she observed multiple handguns and long rifles.  There was no evidence that there were any illegal firearms in the Property.")).  It is counsel's responsibility—not the Court's—to develop the arguments and to identify the relevant evidence supporting Plaintiff's arguments.  Nevertheless, the Court has considered these arguments and finds that they do not raise a genuine issue of material fact as to whether Judge Reed's search warrant was supported by probable cause.

788 F.3d 345, 350 (2d Cir. 2015) ("When reviewing a challenged warrant, [courts] accord considerable deference to the probable cause determination of the issuing magistrate[;] . . . [a]ccordingly, the task of a reviewing court is simply to ensure that the totality of the circumstances afforded the magistrate a substantial basis for making the requisite probable cause determination." (internal quotation marks and citations omitted)); *see also Bancroft v. City of Mt. Vernon*, 672 F. Supp. 2d 391, 401 (S.D.N.Y. 2009) ("Any doubt about the existence of probable cause must be resolved in favor of upholding the warrant." (citing *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998))). Defendants accordingly are entitled to summary judgment on Count II.

### C.     Count III: Scope

Plaintiffs also allege that Judge Reed's search warrant was unconstitutionally overbroad. (*See* Dkt. 35 at ¶¶ 425-51). They assert that the warrant "did not describe the items to be seized with particularity," such as the "alleged black[] Glock," and authorized the executing officers to search for "other personal property," which "encompasses the entire world of lawful property." (*See id.* at ¶¶ 432-33, 439-40). Defendants argue that Judge Reed's search warrant was sufficiently particular because it "identifie[d] the particular crimes for which evidence [was] sought, and then provide[d] an illustrative list of items to be seized, all of which relate[d] to property that would be evidence of those crimes." (*See* Dkt. 53 at 19-20). The Court agrees with Defendants.

"Search warrant procedures are not mere formalities; they protect against 'indiscriminate searches and seizures.'" *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (quoting *Payton v. New York*, 445 U.S. 573, 583 (1980)). "Indeed, the

Fourth Amendment requires that the search warrant describe with particularity the place to be searched and the items to be seized." *Id.* (citing *Kentucky v. King*, 563 U.S. 452, 459 (2011)). "To satisfy the Fourth Amendment's particularity requirement, a warrant must meet three criteria: (1) it must identify the specific offense for which the police have established probable cause; (2) it must describe the place to be searched; and (3) it must specify the items to be seized by their relation to designated crimes." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (internal quotation marks and citation omitted).

In this case, Judge Reed's search warrant met all three criteria. It directed officers to search "[t]he residence, curtilage and outbuildings located at 4859 Townline R[oad,] Gorham, NY." (Dkt. 53-29 at 2). It also listed the four offenses for which there was probable cause to search, and in relation to those offenses, it directed officers to search for: (1) "[h]andguns, magazines, ammunition, holsters and other peripheral property associated with the possession and ownership of a handgun"; (2) "[d]rugs including but not limited to LSD and cocaine"; and (3) "[b]loody clothing, shoes or other personal property." (*Id.*).

Further, the warrant did not need to instruct officers to search specifically for a black Glock, and the phrase "other personal property" did not render the warrant unconstitutionally overbroad. *See, e.g.*, *United States v. Lustyik*, 57 F. Supp. 3d 213, 227 (S.D.N.Y. 2014) (upholding warrant that "broadly describe[d] the items to be seized as 'evidence, fruits, or instrumentalities' of specified federal crimes, [while] also set[ting] forth an illustrative list of items to be seized"); *see also United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." (alteration, internal

quotation marks, and citation omitted)).    The scope of Judge Reed's search warrant therefore was sufficiently particular,[14] and Defendants are entitled to summary judgment on Count III.

### D.    Counts IV and XVI: Excessive Force

Plaintiffs allege that Defendants' deployment of the SWAT team itself constituted an unreasonable and excessive use of force.  (*See* Dkt. 35 at ¶¶ 452-82).  They alternatively allege that Defendants' decision to deploy the SWAT team was made pursuant to an unconstitutional policy or custom of Ontario County.  (*See id.* at ¶¶ 622-27).  In response, Defendants argue: (1) Plaintiffs had no clearly established right to be free from the deployment of a SWAT team; and (2) even if Plaintiffs had such a right, Defendants would be entitled to summary judgment on qualified immunity grounds.[15]  (*See* Dkt. 53-42 at 20-21).  The Court agrees that Defendants are entitled to summary judgment on the excessive force counts.

---

[14]    The Court has considered Plaintiffs' other challenges to the scope of Judge Reed's search warrant (*see, e.g.*, Dkt. 58-1 at ¶ 44 (arguing that "[Investigator] Bowerman either lied or recklessly misrepresented facts to obtain a search warrant broader in scope and reach than legally authorized")), and finds that they do not raise a genuine issue of material fact whether the warrant satisfied the Fourth Amendment's particularity requirement.

[15]    "Any claim for damages against officials in their individual capacities . . . implicates the doctrine of qualified immunity."  *Tanvir v. Tanzin*, 120 F.4th 1049, 1059 (2d Cir. 2024) (internal quotation marks and citation omitted).  "That doctrine 'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  Thus, "qualified immunity shields a defendant-official from money damages unless 'the plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'"  *Id.* at 1060 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

"The Fourth Amendment protects individuals from seizures executed with excessive force." *Dancy v. McGinley*, 843 F.3d 93, 116 (2d Cir. 2016). "Whether the force used was excessive is analyzed under the Fourth Amendment's 'reasonableness' standard, and determined by 'balancing . . . "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake.'" *Id.* (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)). The Second Circuit, however, has determined that "there is no clearly established right . . . to be free from the deployment of a [SWAT] team in general." *Terebesi v. Torreso*, 764 F.3d 217, 233 (2d Cir. 2014); *see also Merrill v. Schell*, 279 F. Supp. 3d 438, 443 (W.D.N.Y. 2017) ("Courts within the Second Circuit have been reluctant to entertain excessive force claims without any physical contact.").

Plaintiffs base their excessive force claims solely on Defendants' decision to deploy the SWAT team.[16] (*See* Dkt. 35 at ¶¶ 452-82, 622-27; *see also* Dkt. 53-8 at 9, 28-30, 34-

---

[16]    In their Local Rule 56(a)(2) Opposing Statement, Plaintiffs assert that the officers violently "threw" Abigail and Andrew to the ground before handcuffing and searching them. (*See* Dkt. 58-1 at ¶¶ 67, 81). But Plaintiffs make no argument in support of this theory of excessive force in their memorandum of law in opposition (or elsewhere). And even if Plaintiffs had properly raised this theory of liability, the undisputed facts—as reflected by the video evidence—do not support Plaintiffs' position. The video evidence shows that Abigail either tripped or was pushed to the ground by Investigator Hudgins. (*see* Dkt. 53-18 at 21:30-21:40)—but it does not support the suggestion that she was "thrown" to the ground or that placing her on the ground came anywhere close to excessive force. Similarly, the video evidence shows that the officers did not throw or push Andrew to the ground. (*See* Dkt. 53-17 at 35:20-35:40; Dkt. 53-18 at 41:00-41:20). As such, to the extent Abigail and Andrew allege excessive force claims based on the officers' actual use of physical force, those claims do not survive summary judgment. *See Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (internal quotation marks and citation

35).  This they cannot do.  *See, e.g.*, *Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) ("We do not doubt that the presence of police officers with guns drawn in their home was a traumatic experience for plaintiffs[;] [b]ut the officers' decision to draw their weapons while searching the [r]esidence for guns, drugs, and a drug dealer was objectively reasonable." (also collecting cases)); *see also Dalia v. United States*, 441 U.S. 238, 257 (1979) ("[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant. . . .").  What is more, Ontario County cannot be held liable for promulgating an unconstitutional policy or custom in the absence of an underlying excessive force violation.  *See Curley*, 268 F.3d at 71 ("[A] municipality cannot be liable . . . when the officers involved . . . did not violate the plaintiff's constitutional rights."); *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . [that] can be attributed to a municipal policymaker.").  For those reasons, Defendants are entitled to summary judgment on Count IV and Count XVI.

---

omitted)).  At a minimum, Defendants would be entitled to qualified immunity on this theory of liability.

E.    **Counts V through XII: Individual Search and Seizure**

In their third amended complaint, Plaintiffs allege that Defendants illegally searched and seized Abigail, Andrew, and Rutsch during execution of the search warrant. (*See* Dkt. 35 at ¶¶ 483-507, 567-89). They also allege that Defendants illegally seized R.R., F.R., H.Z., M.Z., and R.Z. (*See id.* at ¶¶ 508-66). But in their memorandum of law in opposition to the pending motion (Dkt. 58), Plaintiffs make no legal argument in support of these claims. While they contend in a conclusory and general fashion that the facts are disputed, they are not—indeed, the video evidence establishes what occurred on the date in question.

Defendants argue that they are entitled to summary judgment on these counts because "it is well-settled that in the context of executing a search warrant, officers are privileged to detain individuals, even to the point of handcuffing them, while the search is carried out." (Dkt. 53-42 at 28). They also argue that officers "have the authority to detain and frisk individuals whom they encounter while executing a search warrant, even if they have no particularized suspicion regarding the persons being searched." (*Id.* at 29 (internal quotation marks and citation omitted)). The Court agrees with Defendants.

"[T]he police . . . have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion." *Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991) (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)); *see also Bailey v. United States*, 568 U.S. 186, 201-02 (2013) (holding that *Summers* is spatially constrained and limited to the immediate vicinity of the premises to be searched). "They also have the authority to make a limited search of an individual on those premises as a self-protective measure." *Id.* "An officer's authority to detain incident

to a search is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (internal quotation marks and citation omitted). Further, "[t]he government's interest in detention is heightened when the warrant has authorized the police to search the premises for weapons." *Lynch*, 567 F. Supp. 2d at 467 (citing *Muehler*, 544 U.S. at 100).

In this case, the facts are undisputed—as depicted by the video evidence—that Abigail, Rutsch, and Andrew were searched in connection with execution of the search warrant. (*See* Dkt. 53-17 at 18:40-19:10 (footage of Sergeant Taylor's search of Abigail); Dkt. 53-18 at 23:20-23:45 (footage of Investigator Hudgins' search of Rutsch); *id.* at 42:05-42:50 (footage of Investigator Hudgins' search of Andrew)). Under these facts, no reasonable jury could conclude that it was objectively unreasonable for Defendants to handcuff and frisk Abigail, Rutsch, and Andrew. *See, e.g.*, *Jackson ex rel. Jackson v. Suffolk Cnty.*, 87 F. Supp. 3d 386, 401 (E.D.N.Y. 2015) ("There is no evidence that any officers used excessive force in handcuffing [the plaintiff] or detaining her during the search[;] [she] has proffered no evidence of any special circumstances that might have made her detention during the search unlawful."). Similarly, there is no dispute that Plaintiffs were detained for about two hours at a secure location nearby, while the search warrant was executed. (*See* Dkt. 53-1 at ¶ 107; Dkt. 58-1 at ¶ 107). Again, no reasonable jury could conclude that it was objectively unreasonable for Defendants to detain Plaintiffs in this manner while they cleared Rutsch's property. *See, e.g.*, *Lynch*, 567 F. Supp. 3d at 467-69. Thus, Defendants are entitled to summary judgment on Count V, Count VI, Count VII, Count VIII, Count IX, Count X, Count XI, and Count XII.

### F.    Count XIII: Drone

Plaintiffs allege that Investigator Bowerman illegally used a drone to take photographs of Rutsch's property before applying for the search warrant. (*See* Dkt. 35 at ¶¶ 590-99). Rutsch's two oldest children—R.R. and F.R.—testified that they saw a large bird, which they later concluded must have been a drone after seeing aerial photographs of their home during Defendants' execution of the search warrant. (*See* Dkt. 53-9 at 5-8).

Defendants respond that "there was no drone surveillance undertaken in connection with [Investigator Bowerman's] investigation of [Rutsch's] [p]roperty." (Dkt. 53-52 at 31). The evidence in this case establishes that Defendants used aerial photographs of Rutsch's property to formulate their proposed entry plan. (*See* Dkt. 53-36 at 2-4). But according to Investigator Bowerman, he did not fly a drone over Rutsch's property or order anyone else to do so. (*See* Dkt. 53-5 at 55-56). And according to Lieutenant Green's final report, he was "provided with satellite imagery from Google Earth" of Rutsch's property when reviewing his team's proposed entry plan. (*See* Dkt. 53-38 at 2).

Ultimately, the testimony of R.R. and F.R.—which amounts only to an assumption about a large bird, and then a drone—is insufficient to create a genuine issue of material fact regarding whether Investigator Bowerman used a drone to take photographs of Rutsch's property before applying for the search warrant. *Cf. Hawkins v. N.Y. State Off. of Mental Health*, No. 17-CV-649 (NSR), 2019 WL 4520801, at *12 (S.D.N.Y. Sept. 19, 2019) ("Plaintiff's own self-serving statements, in her affidavits, memoranda, and deposition are simply insufficient to overcome her burden of proof to survive summary judgment, as they all are self-serving statements uncorroborated by any additional

evidence."), *aff'd*, 845 F. App'x 9 (2d Cir. 2021).  As such, Defendants are entitled to summary judgment on Count XIII.

### G. Count XIV: Seizure of Handgun

Plaintiffs allege that Defendants' seizure of Rutsch's handgun violated not only her Fourth Amendment rights but also her Second Amendment rights.  (*See* Dkt. 35 at ¶¶ 600-08).  Defendants argue that Rutsch's handgun "was evidence that was properly the subject of the search warrant," and they further assert that they "are unaware of any case law that preclude officers from, in accordance with a search warrant, seizing a 'lawfully owned' firearm that constitutes evidence of a felony crime being investigated."  (Dkt. 53-42 at 30).  Plaintiffs fail to address this point in their response to Defendants' motion for summary judgment.  (*See* Dkt. 58 at 3-5).

The Court agrees with Defendants that the seizure of the handgun pursuant to a lawfully executed search warrant does not amount to a violation of the Second Amendment.  *See, e.g.*, *Sutterfield v. City of Milwaukee*, 870 F. Supp. 2d 633, 641-42 (E.D. Wis. 2012) (rejecting the plaintiff's claim that the seizure of her handguns and licenses during search violated her Second Amendment rights, and explaining that there is no absolute right to keep a handgun, the law does not prohibit the government from seizing firearms for certain purposes, and noting that "[i]f we were to accept [the plaintiff's] argument, the government could seemingly never seize a handgun as evidence or prevent felons from owning handguns"), *aff'd*, 751 F.3d 542 (7th Cir. 2014).  Plaintiffs offer no argument or evidence to the contrary, and accordingly, Defendants are entitled to summary judgment on Count XIV.

## H.    Count XV: "No-Knock" and "Any Time" Designations

Lastly, Plaintiffs allege that Investigator Bowerman "unlawfully secured a no-knock warrant to be executed at any time of the day or night in contravention of [New York Criminal Procedure Law § 690.35(4)] and to Plaintiffs' detriment." (*See* Dkt. 35 at ¶ 620). Defendants respond that: (1) the "no-knock" and "any time" designations were appropriate given "the nature of the alleged violent felony with a firearm [by Rutsch] and the potential for evidence to be destroyed of if notice was provided"; and (2) even if those designations were improper, Defendants did not violate Plaintiffs' Fourth Amendment rights "because the warrant was not executed in a 'no-knock' fashion and was not executed after 9:00 p.m." (*See* Dkt. 53-42 at 27-28 (emphases omitted)). Defendants are correct on both points.

New York Criminal Procedure Law § 690.35(4) provides that a search warrant application may contain "[a] request that the search warrant be made executable at any time of the day or night, upon the ground that there is reasonable cause to believe that (i) it cannot be executed between the hours of 6:00 A.M. and 9:00 P.M., or (ii) the property sought will be removed or destroyed if not seized forthwith." N.Y. Crim. Proc. Law § 390.35(4)(a). That section also provides that a search warrant application may contain "[a] request that the search warrant authorize the executing police officer to enter premises to be searched without giving notice of his authority and purpose, upon the ground that there is reasonable cause to believe that (i) the property sought may be easily and quickly destroyed or disposed of, or (ii) the giving of such notice may endanger the life or safety of the executing officer or another person." *Id.* § 390.35(4)(b).

Investigator Bowerman requested that the search warrant contain the "no-knock" designation based on: (1) "the nature of [the] crimes committed"; (2) Rutsch "having readily accessible weapons"; and (3) the possibility that Rutsch's husband, who had military training, "m[ight] have passed along tactical training to [Rutsch]." (Dkt. 53-27 at 5). And he requested that the search warrant contain the "any time" designation "[d]ue to the time it may take for planning and executing the warrant." (*Id.*). Investigator Bowerman's desire to ensure officer safety and to obtain evidence of a firearm-related assault as soon as practicable were sufficient reasons for Judge Reed to approve the "no-knock" and "any time" designations. *See, e.g.*, *Sanders*, 360 F. Supp. 3d at 163 ("Because the warrant sought . . . firearms and firearm equipment related to a murder that was committed a day prior to [the officer] drafting the [a]ffidavit, it was reasonable for [the issuing judge] to approve the no-knock entry."); *People v. Ferguson*, 136 A.D.3d 1070, 1073 (3d Dep't 2016) (upholding validity of "any time" warrant where "[t]he practicalities of the situation establish[ed] that it would have been unreasonable for the police to wait an additional five or six hours to execute a warrant").

Further, it is undisputed that Defendants executed the warrant at 7:59 p.m., and did so using a "surround and callout" method, rather than a "no-knock" method. (*See* Dkt. 53-6 at 11; Dkt. 53-7 at 11). So even if the "no-knock" and "any time" designations in Judge Reed's search warrant were improper, their inclusion did not violate Plaintiffs' Fourth Amendment rights. *See United States v. Williams*, 82 F. App'x 248, 250 (2d Cir. 2003). For those reasons, Defendants are entitled to summary judgment on Count XV.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants' motion for summary judgment (Dkt. 53) is granted.  The Clerk of the Court is directed to enter judgment in favor of Defendants and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      March 18, 2025
            Rochester, New York

- 34 -